BOYLE, PERSONAL REPRESENTATIVE OF THE HEIRS AND ESTATE OF BOYLE *v.* UNITED TECHNOLOGIES CORP.

No. 86–492. Argued October 13, 1987—Reargued April 27, 1988—Decided June 27, 1988

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, and KENNEDY, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 515. STEVENS, J., filed a dissenting opinion, *post*, p. 531.

*Louis S. Franecke* reargued the cause for petitioner. With him on the briefs was *John O. Mack.*

*Philip A. Lacovara* reargued the cause for respondent. With him on the briefs were *Lewis T. Booker, W. Stanfield Johnson,* and *William R. Stein.*

*Deputy Solicitor General Ayer* reargued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Fried, Assistant*

Attorney General Willard, Deputy Assistant Attorneys General Spears and Willmore, and Christopher J. Wright.*

JUSTICE SCALIA delivered the opinion of the Court.

This case requires us to decide when a contractor providing military equipment to the Federal Government can be held liable under state tort law for injury caused by a design defect.

I

On April 27, 1983, David A. Boyle, a United States Marine helicopter copilot, was killed when the CH–53D helicopter in which he was flying crashed off the coast of Virginia Beach, Virginia, during a training exercise. Although Boyle survived the impact of the crash, he was unable to escape from the helicopter and drowned. Boyle's father, petitioner here, brought this diversity action in Federal District Court against the Sikorsky Division of United Technologies Corporation (Sikorsky), which built the helicopter for the United States.

---

*Briefs of amici curiae urging reversal were filed for Edwin Lees Shaw by Joel D. Eaton and Robert L. Parks; and for Joan S. Tozer et al. by Michael J. Pangia.

Briefs of amici curiae urging affirmance were filed for the Chamber of Commerce of the United States by Herbert L. Fenster, Raymond B. Biagini, and Robin S. Conrad; for the Defense Research Institute, Inc., by James W. Morris III, Ann Adams Webster, and Donald F. Pierce; for Grumman Aerospace Corp. by James M. FitzSimons, Frank J. Chiarchiaro, Charles M. Shaffer, Jr., L. Joseph Loveland, and Gary J. Toman; for the National Security Industrial Association et al. by Kenneth S. Geller and Andrew L. Frey; and for the Product Liability Advisory Council, Inc., et al. by Michael Hoenig, David B. Hamm, William H. Crabtree, and Edward P. Good.

Briefs of amici curiae were filed for the Association of Trial Lawyers of America by Robert L. Habush, Dale Haralson, and Denneen L. Peterson; for Bell Helicopter Textron Inc. by R. David Broiles, George Galerstein, and James W. Hunt; and for UNR Industries, Inc., by Joe G. Hollingsworth.

At trial, petitioner presented two theories of liability under Virginia tort law that were submitted to the jury. First, petitioner alleged that Sikorsky had defectively repaired a device called the servo in the helicopter's automatic flight control system, which allegedly malfunctioned and caused the crash. Second, petitioner alleged that Sikorsky had defectively designed the copilot's emergency escape system: the escape hatch opened out instead of in (and was therefore ineffective in a submerged craft because of water pressure), and access to the escape hatch handle was obstructed by other equipment. The jury returned a general verdict in favor of petitioner and awarded him $725,000. The District Court denied Sikorsky's motion for judgment notwithstanding the verdict.

The Court of Appeals reversed and remanded with directions that judgment be entered for Sikorsky. 792 F. 2d 413 (CA4 1986). It found, as a matter of Virginia law, that Boyle had failed to meet his burden of demonstrating that the repair work performed by Sikorsky, as opposed to work that had been done by the Navy, was responsible for the alleged malfunction of the flight control system. *Id.*, at 415–416. It also found, as a matter of federal law, that Sikorsky could not be held liable for the allegedly defective design of the escape hatch because, on the evidence presented, it satisfied the requirements of the "military contractor defense," which the court had recognized the same day in *Tozer* v. *LTV Corp.*, 792 F. 2d 403 (CA4 1986). 792 F. 2d, at 414–415.

Petitioner sought review here, challenging the Court of Appeals' decision on three levels: First, petitioner contends that there is no justification in federal law for shielding Government contractors from liability for design defects in military equipment. Second, he argues in the alternative that even if such a defense should exist, the Court of Appeals' formulation of the conditions for its application is inappropriate. Finally, petitioner contends that the Court of Appeals erred in not remanding for a jury determination of whether the ele-

ments of the defense were met in this case. We granted certiorari, 479 U. S. 1029 (1986).

## II

Petitioner's broadest contention is that, in the absence of legislation specifically immunizing Government contractors from liability for design defects, there is no basis for judicial recognition of such a defense. We disagree. In most fields of activity, to be sure, this Court has refused to find federal pre-emption of state law in the absence of either a clear statutory prescription, see, *e. g., Jones* v. *Rath Packing Co.*, 430 U. S. 519, 525 (1977); *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947), or a direct conflict between federal and state law, see, *e. g., Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963); *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941). But we have held that a few areas, involving "uniquely federal interests," *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 640 (1981), are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts—so-called "federal common law." See, *e. g., United States* v. *Kimbell Foods, Inc.*, 440 U. S. 715, 726–729 (1979); *Banco Nacional* v. *Sabbatino*, 376 U. S. 398, 426–427 (1964); *Howard* v. *Lyons*, 360 U. S. 593, 597 (1959); *Clearfield Trust Co.* v. *United States*, 318 U. S. 363, 366–367 (1943); *D'Oench, Duhme & Co.* v. *FDIC*, 315 U. S. 447, 457–458 (1942).

The dispute in the present case borders upon two areas that we have found to involve such "uniquely federal interests." We have held that obligations to and rights of the United States under its contracts are governed exclusively by federal law. See, *e. g., United States* v. *Little Lake Misere Land Co.*, 412 U. S. 580, 592–594 (1973); *Priebe & Sons, Inc.* v. *United States*, 332 U. S. 407, 411 (1947); *National Metropolitan Bank* v. *United States*, 323 U. S. 454,

456 (1945); *Clearfield Trust, supra.* The present case does not involve an obligation to the United States under its contract, but rather liability to third persons. That liability may be styled one in tort, but it arises out of performance of the contract—and traditionally has been regarded as sufficiently related to the contract that until 1962 Virginia would generally allow design defect suits only by the purchaser and those in privity with the seller. See *General Bronze Corp.* v. *Kostopulos,* 203 Va. 66, 69–70, 122 S. E. 2d 548, 551 (1961); see also Va. Code § 8.2–318 (1965) (eliminating privity requirement).

Another area that we have found to be of peculiarly federal concern, warranting the displacement of state law, is the civil liability of federal officials for actions taken in the course of their duty. We have held in many contexts that the scope of that liability is controlled by federal law. See, *e. g.,* *Westfall* v. *Erwin,* 484 U. S. 292, 295 (1988); *Howard* v. *Lyons, supra,* at 597; *Barr* v. *Matteo,* 360 U. S. 564, 569–574 (1959) (plurality opinion); *id.;* at 577 (Black, J., concurring); see also *Yaselli* v. *Goff,* 12 F. 2d 396 (CA2 1926), aff'd, 275 U. S. 503 (1927) *(per curiam); Spalding* v. *Vilas,* 161 U. S. 483 (1896); *Bradley* v. *Fisher,* 13 Wall. 335 (1872). The present case involves an independent contractor performing its obligation under a procurement contract, rather than an official performing his duty as a federal employee, but there is obviously implicated the same interest in getting the Government's work done.[1]

We think the reasons for considering these closely related areas to be of "uniquely federal" interest apply as well to

---

[1] JUSTICE BRENNAN's dissent misreads our discussion here to "intimat[e] that the immunity [of federal officials] . . . might extend . . . [to] nongovernment employees" such as a Government contractor. *Post,* at 523. But we do not address this issue, as it is not before us. We cite these cases merely to demonstrate that the liability of independent contractors performing work for the Federal Government, like the liability of federal officials, is an area of uniquely federal interest.

the civil liabilities arising out of the performance of federal procurement contracts. We have come close to holding as much. In *Yearsley* v. *W. A. Ross Construction Co.*, 309 U. S. 18 (1940), we rejected an attempt by a landowner to hold a construction contractor liable under state law for the erosion of 95 acres caused by the contractor's work in constructing dikes for the Government. We said that "if [the] authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." *Id.*, at 20–21. The federal interest justifying this holding surely exists as much in procurement contracts as in performance contracts; we see no basis for a distinction.

Moreover, it is plain that the Federal Government's interest in the procurement of equipment is implicated by suits such as the present one—even though the dispute is one between private parties. It is true that where "litigation is purely between private parties and does not touch the rights and duties of the United States," *Bank of America Nat. Trust & Sav. Assn.* v. *Parnell*, 352 U. S. 29, 33 (1956), federal law does not govern. Thus, for example, in *Miree* v. *DeKalb County*, 433 U. S. 25, 30 (1977), which involved the question whether certain private parties could sue as third-party beneficiaries to an agreement between a municipality and the Federal Aviation Administration, we found that state law was not displaced because "the operations of the United States in connection with FAA grants such as these . . . would [not] be burdened" by allowing state law to determine whether third-party beneficiaries could sue, *id.*, at 30, and because "any federal interest in the outcome of the [dispute] before us '[was] far too speculative, far too remote a possibility to justify the application of federal law to transactions essentially of local concern.'" *Id.*, at 32–33, quoting *Parnell, supra*, at 33–34; see also *Wallis* v. *Pan American Petro-*

*leum Corp.*, 384 U. S. 63, 69 (1966).[2] But the same is not true here. The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected.

That the procurement of equipment by the United States is an area of uniquely federal interest does not, however, end the inquiry. That merely establishes a necessary, not a sufficient, condition for the displacement of state law.[3] Displacement will occur only where, as we have variously described, a "significant conflict" exists between an identifiable "federal policy or interest and the [operation] of state law," *Wallis, supra*, at 68, or the application of state law would "frustrate specific objectives" of federal legislation, *Kimbell Foods*, 440 U. S., at 728. The conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates "in a field which the States have traditionally occupied." *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S., at 230. Or to put the point differently, the

---

[2] As this language shows, JUSTICE BRENNAN's dissent is simply incorrect to describe *Miree* and other cases as declining to apply federal law despite the assertion of interests "comparable" to those before us here. *Post*, at 521–522.

[3] We refer here to the displacement of state law, although it is possible to analyze it as the displacement of federal-law reference to state law for the rule of decision. Some of our cases appear to regard the area in which a uniquely federal interest exists as being entirely governed by federal law, with federal law deigning to "borro[w]," *United States* v. *Little Lake Misere Land Co.*, 412 U. S. 580, 594 (1973), or "incorporat[e]" or "adopt" *United States* v. *Kimbell Foods, Inc.*, 440 U. S. 715, 728, 729, 730 (1979), state law except where a significant conflict with federal policy exists. We see nothing to be gained by expanding the theoretical scope of the federal pre-emption beyond its practical effect, and so adopt the more modest terminology. If the distinction between displacement of state law and displacement of federal law's incorporation of state law ever makes a practical difference, it at least does not do so in the present case.

fact that the area in question *is* one of unique federal concern changes what would otherwise be a conflict that cannot produce pre-emption into one that can.[4] But conflict there must be. In some cases, for example where the federal interest requires a uniform rule, the entire body of state law applicable to the area conflicts and is replaced by federal rules. See, *e. g., Clearfield Trust,* 318 U. S., at 366–367 (rights and obligations of United States with respect to commercial paper must be governed by uniform federal rule). In others, the conflict is more narrow, and only particular elements of state law are superseded. See, *e. g., Little Lake Misere Land Co.,* 412 U. S., at 595 (even assuming state law should generally govern federal land acquisitions, particular state law at issue may not); *Howard* v. *Lyons,* 360 U. S., at 597 (state defamation law generally applicable to federal official, but federal privilege governs for statements made in the course of federal official's duties).

In *Miree, supra,* the suit was not seeking to impose upon the person contracting with the Government a duty contrary to the duty imposed by the Government contract. Rather, it was the contractual duty *itself* that the private plaintiff (as third-party beneficiary) sought to enforce. Between *Miree*

---

[4] Even before our landmark decision in *Clearfield Trust Co.* v. *United States,* 318 U. S. 363 (1943), the distinctive federal interest in a particular field was used as a significant factor giving broad pre-emptive effect to federal legislation in that field:

"It cannot be doubted that both the state and the federal [alien] registration laws belong 'to that class of laws which concern the exterior relation of this whole nation with other nations and governments.' Consequently the regulation of aliens is . . . intimately blended and intertwined with responsibilities of the national government . . . . And where the federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens, states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations." *Hines* v. *Davidowitz,* 312 U. S. 52, 66–67 (1941) (citation omitted).

and the present case, it is easy to conceive of an intermediate situation, in which the duty sought to be imposed on the contractor is not identical to one assumed under the contract, but is also not contrary to any assumed. If, for example, the United States contracts for the purchase and installation of an air-conditioning unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. No one suggests that state law would generally be pre-empted in this context.

The present case, however, is at the opposite extreme from *Miree*. Here the state-imposed duty of care that is the asserted basis of the contractor's liability (specifically, the duty to equip helicopters with the sort of escape-hatch mechanism petitioner claims was necessary) is precisely contrary to the duty imposed by the Government contract (the duty to manufacture and deliver helicopters with the sort of escape-hatch mechanism shown by the specifications). Even in this sort of situation, it would be unreasonable to say that there is always a "significant conflict" between the state law and a federal policy or interest. If, for example, a federal procurement officer orders, by model number, a quantity of stock helicopters that happen to be equipped with escape hatches opening outward, it is impossible to say that the Government has a significant interest in that particular feature. That would be scarcely more reasonable than saying that a private individual who orders such a craft by model number cannot sue for the manufacturer's negligence because he got precisely what he ordered.

In its search for the limiting principle to identify those situations in which a "significant conflict" with federal policy or interests does arise, the Court of Appeals, in the lead case

upon which its opinion here relied, identified as the source of the conflict the *Feres* doctrine, under which the Federal Tort Claims Act (FTCA) does not cover injuries to Armed Services personnel in the course of military service. See *Feres* v. *United States*, 340 U. S. 135 (1950). Military contractor liability would conflict with this doctrine, the Fourth Circuit reasoned, since the increased cost of the contractor's tort liability would be added to the price of the contract, and "[s]uch pass-through costs would . . . defeat the purpose of the immunity for military accidents conferred upon the government itself." *Tozer*, 792 F. 2d, at 408. Other courts upholding the defense have embraced similar reasoning. See, *e. g.*, *Bynum* v. *FMC Corp.*, 770 F. 2d 556, 565–566 (CA5 1985); *Tillett* v. *J. I. Case Co.*, 756 F. 2d 591, 596–597 (CA7 1985); *McKay* v. *Rockwell Int'l Corp.*, 704 F. 2d 444, 449 (CA9 1983), cert. denied, 464 U. S. 1043 (1984). We do not adopt this analysis because it seems to us that the *Feres* doctrine, in its application to the present problem, logically produces results that are in some respects too broad and in some respects too narrow. Too broad, because if the Government contractor defense is to prohibit suit against the manufacturer whenever *Feres* would prevent suit against the Government, then even injuries caused to military personnel by a helicopter purchased from stock (in our example above), or by any standard equipment purchased by the Government, would be covered. Since *Feres* prohibits all service-related tort claims against the Government, a contractor defense that rests upon it should prohibit all service-related tort claims against the manufacturer—making inexplicable the three limiting criteria for contractor immunity (which we will discuss presently) that the Court of Appeals adopted. On the other hand, reliance on *Feres* produces (or logically should produce) results that are in another respect too narrow. Since that doctrine covers only service-related injuries, and not injuries caused by the military to civilians, it could not be invoked to prevent, for example, a civilian's suit against the manufacturer of fighter planes, based on a state

tort theory, claiming harm from what is alleged to be needlessly high levels of noise produced by the jet engines. Yet we think that the character of the jet engines the Government orders for its fighter planes cannot be regulated by state tort law, no more in suits by civilians than in suits by members of the Armed Services.

There is, however, a statutory provision that demonstrates the potential for, and suggests the outlines of, "significant conflict" between federal interests and state law in the context of Government procurement. In the FTCA, Congress authorized damages to be recovered against the United States for harm caused by the negligent or wrongful conduct of Government employees, to the extent that a private person would be liable under the law of the place where the conduct occurred. 28 U. S. C. § 1346(b). It excepted from this consent to suit, however,

> "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U. S. C. § 2680(a).

We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting "second-guessing" of these judgments, see *United States* v. *Varig Airlines*, 467 U. S. 797, 814 (1984), through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the

United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs. To put the point differently: It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production. In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a "significant conflict" with federal policy and must be displaced.[5]

We agree with the scope of displacement adopted by the Fourth Circuit here, which is also that adopted by the Ninth Circuit, see *McKay* v. *Rockwell Int'l Corp., supra,* at 451. Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. The first two of these conditions assure that the suit is within the area where the policy of the "discretionary function" would be frustrated—*i. e.,* they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself. The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability. We adopt this provision lest our effort to pro-

---

[5]JUSTICE BRENNAN's assumption that the outcome of this case would be different if it were brought under the Death on the High Seas Act, Act of Mar. 30, 1920, ch. 111, § 1 *et seq.* (1982 ed., Supp. IV), 41 Stat. 537, codified at 46 U. S. C. App. § 761 *et seq.,* is not necessarily correct. That issue is not before us, and we think it inappropriate to decide it in order to refute (or, for that matter, to construct) an alleged inconsistency.

tect discretionary functions perversely impede them by cutting off information highly relevant to the discretionary decision.

We have considered the alternative formulation of the Government contractor defense, urged upon us by petitioner, which was adopted by the Eleventh Circuit in *Shaw* v. *Grumman Aerospace Corp.*, 778 F. 2d 736, 746 (1985), cert. pending, No. 85–1529. That would preclude suit only if (1) the contractor did not participate, or participated only minimally, in the design of the defective equipment; *or* (2) the contractor timely warned the Government of the risks of the design and notified it of alternative designs reasonably known by it, *and* the Government, although forewarned, clearly authorized the contractor to proceed with the dangerous design. While this formulation may represent a perfectly reasonable tort rule, it is not a rule designed to protect the federal interest embodied in the "discretionary function" exemption. The design ultimately selected may well reflect a significant policy judgment by Government officials whether or not the contractor rather than those officials developed the design. In addition, it does not seem to us sound policy to penalize, and thus deter, active contractor participation in the design process, placing the contractor at risk unless it identifies all design defects.

### III

Petitioner raises two arguments regarding the Court of Appeals' application of the Government contractor defense to the facts of this case. First, he argues that since the formulation of the defense adopted by the Court of Appeals differed from the instructions given by the District Court to the jury, the Seventh Amendment guarantee of jury trial required a remand for trial on the new theory. We disagree. If the evidence presented in the first trial would not suffice, as a matter of law, to support a jury verdict under the properly formulated defense, judgment could properly be entered for the respondent at once, without a new trial. And that is so even though (as petitioner claims) respondent failed to

object to jury instructions that expressed the defense differently, and in a fashion that would support a verdict. See *St. Louis* v. *Praprotnik*, 485 U. S. 112, 118–120 (1988) (plurality opinion of O'CONNOR, J., joined by REHNQUIST, C. J., WHITE, and SCALIA, JJ.); *Ebker* v. *Tan Jay Int'l, Ltd.*, 739 F. 2d 812, 825–826, n. 17 (CA2 1984) (Friendly, J.); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2537, pp. 599–600 (1971).

It is somewhat unclear from the Court of Appeals' opinion, however, whether it was in fact deciding that no reasonable jury could, under the properly formulated defense, have found for the petitioner on the facts presented, or rather was assessing on its own whether the defense had been established. The latter, which is what petitioner asserts occurred, would be error, since whether the facts establish the conditions for the defense is a question for the jury. The critical language in the Court of Appeals' opinion was that "[b]ecause Sikorsky has satisfied the requirements of the military contractor defense, it can incur no liability for . . . the allegedly defective design of the escape hatch." 792 F. 2d, at 415. Although it seems to us doubtful that the Court of Appeals was conducting the factual evaluation that petitioner suggests, we cannot be certain from this language, and so we remand for clarification of this point. If the Court of Appeals was saying that no reasonable jury could find, under the principles it had announced and on the basis of the evidence presented, that the Government contractor defense was inapplicable, its judgment shall stand, since petitioner did not seek from us, nor did we grant, review of the sufficiency-of-the-evidence determination. If the Court of Appeals was not saying that, it should now undertake the proper sufficiency inquiry.

Accordingly, the judgment is vacated and the case is remanded.

*So ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

Lieutenant David A. Boyle died when the CH–53D helicopter he was copiloting spun out of control and plunged into the ocean. We may assume, for purposes of this case, that Lt. Boyle was trapped under water and drowned because respondent United Technologies negligently designed the helicopter's escape hatch. We may further assume that any competent engineer would have discovered and cured the defects, but that they inexplicably escaped respondent's notice. Had respondent designed such a death trap for a commercial firm, Lt. Boyle's family could sue under Virginia tort law and be compensated for his tragic and unnecessary death. But respondent designed the helicopter for the Federal Government, and that, the Court tells us today, makes all the difference: Respondent is immune from liability so long as it obtained approval of "reasonably precise specifications"— perhaps no more than a rubber stamp from a federal procurement officer who might or might not have noticed or cared about the defects, or even had the expertise to discover them.

If respondent's immunity "bore the legitimacy of having been prescribed by the people's elected representatives," we would be duty bound to implement their will, whether or not we approved. *United States* v. *Johnson*, 481 U. S. 681, 703 (1987) (dissenting opinion of SCALIA, J.). Congress, however, has remained silent—and conspicuously so, having resisted a sustained campaign by Government contractors to legislate for them some defense.[1] The Court—unelected and unaccountable to the people—has unabashedly stepped into

---

[1] See, *e. g.*, H. R. 4765, 99th Cong., 2d Sess. (1986) (limitations on civil liability of Government contractors); S. 2441, 99th Cong., 2d Sess. (1986) (same). See also H. R. 2378, 100th Cong., 1st Sess. (1987) (indemnification of civil liability for Government contractors); H. R. 5883, 98th Cong., 2d Sess. (1984) (same); H. R. 1504, 97th Cong., 1st Sess. (1981) (same); H. R. 5351, 96th Cong., 1st Sess. (1979) (same).

the breach to legislate a rule denying Lt. Boyle's family the compensation that state law assures them. This time the injustice is of this Court's own making.

Worse yet, the injustice will extend far beyond the facts of this case, for the Court's newly discovered Government contractor defense is breathtakingly sweeping. It applies not only to military equipment like the CH–53D helicopter, but (so far as I can tell) to any made-to-order gadget that the Federal Government might purchase after previewing plans—from NASA's Challenger space shuttle to the Postal Service's old mail cars. The contractor may invoke the defense in suits brought not only by military personnel like Lt. Boyle, or Government employees, but by anyone injured by a Government contractor's negligent design, including, for example, the children who might have died had respondent's helicopter crashed on the beach. It applies even if the Government has not intentionally sacrificed safety for other interests like speed or efficiency, and, indeed, even if the equipment is not of a type that is typically considered dangerous; thus, the contractor who designs a Government building can invoke the defense when the elevator cable snaps or the walls collapse. And the defense is invocable regardless of how blatant or easily remedied the defect, so long as the contractor missed it and the specifications approved by the Government, however unreasonably dangerous, were "reasonably precise." *Ante*, at 512.

In my view, this Court lacks both authority and expertise to fashion such a rule, whether to protect the Treasury of the United States or the coffers of industry. Because I would leave that exercise of legislative power to Congress, where our Constitution places it, I would reverse the Court of Appeals and reinstate petitioner's jury award.

## I

Before our decision in *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), federal courts sitting in diversity were generally free, in the absence of a controlling state statute, to fashion

rules of "general" federal common law. See, *e. g.*, *Swift* v. *Tyson*, 16 Pet. 1 (1842). *Erie* renounced the prevailing scheme: "Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State." 304 U. S., at 78. The Court explained that the expansive power that federal courts had theretofore exercised was an unconstitutional "'invasion of the authority of the State and, to that extent, a denial of its independence.'" *Id.*, at 79 (citation omitted). Thus, *Erie* was deeply rooted in notions of federalism, and is most seriously implicated when, as here, federal judges displace the state law that would ordinarily govern with their own rules of federal common law. See, *e. g.*, *United States* v. *Standard Oil Co.*, 332 U. S. 301, 307 (1947).[2]

In pronouncing that "[t]here is no federal general common law," 304 U. S., at 78, *Erie* put to rest the notion that the grant of diversity jurisdiction to federal courts is itself authority to fashion rules of substantive law. See *United States* v. *Little Lake Misere Land Co.*, 412 U. S. 580, 591 (1973). As the author of today's opinion for the Court pronounced for a unanimous Court just two months ago, "'"'we start with the assumption that the historic police powers of the States were not to be superseded . . . unless that was the clear and manifest purpose of Congress.'"'" *Puerto Rico Dept. of Consumer Affairs* v. *Isla Petroleum Corp.*, 485 U. S. 495, 500 (1988) (citations omitted). Just as "[t]here is no federal pre-emption *in vacuo*, without a constitutional text or a federal statute to assert it," *id.*, at 503, federal common law cannot supersede state law *in vacuo* out of no

---

[2] Not all exercises of our power to fashion federal common law displace state law in the same way. For example, our recognition of federal causes of action based upon either the Constitution, see, *e. g.*, *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), or a federal statute, see *Cort* v. *Ash*, 422 U. S. 66 (1975), supplements whatever rights state law might provide, and therefore does not implicate federalism concerns in the same way as does pre-emption of a state-law rule of decision or cause of action. Throughout this opinion I use the word "displace" in the latter sense.

more than an idiosyncratic determination by five Justices that a particular area is "uniquely federal."

Accordingly, we have emphasized that federal common law can displace state law in "few and restricted" instances. *Wheeldin* v. *Wheeler*, 373 U. S. 647, 651 (1963). "[A]bsent some congressional authorization to formulate substantive rules of decision, federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating conflicting rights of States or our relations with foreign nations, and admiralty cases." *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 641 (1981) (footnotes omitted). "The enactment of a federal rule in an area of national concern, and the decision whether to displace state law in doing so, is generally made not by the federal judiciary, purposefully insulated from democratic pressures, but by the people through their elected representatives in Congress." *Milwaukee* v. *Illinois*, 451 U. S. 304, 312–313 (1981). See also *Wallis* v. *Pan American Petroleum Corp.*, 384 U. S. 63, 68 (1966); *Miree* v. *DeKalb County*, 433 U. S. 25, 32 (1977). State laws "should be overridden by the federal courts only where clear and substantial interests of the National Government, which cannot be served consistently with respect for such state interests, will suffer major damage if the state law is applied." *United States* v. *Yazell*, 382 U. S. 341, 352 (1966).

## II

Congress has not decided to supersede state law here (if anything, it has decided not to, see n. 1, *supra*) and the Court does not pretend that its newly manufactured "Government contractor defense" fits within any of the handful of "narrow areas," *Texas Industries, supra*, at 641, of "uniquely federal interests" in which we have heretofore done so, 451 U. S., at 640. Rather, the Court creates a new category of "uniquely federal interests" out of a synthesis of two whose origins predate *Erie* itself: the interest in administering the "obligations to and rights of the United States under its contracts," *ante*,

at 504, and the interest in regulating the "civil liability of federal officials for actions taken in the course of their duty," *ante,* at 505. This case is, however, simply a suit between two private parties. We have steadfastly declined to impose federal contract law on relationships that are collateral to a federal contract, or to extend the federal employee's immunity beyond federal employees. And the Court's ability to list 2, or 10, inapplicable areas of "uniquely federal interest" does not support its conclusion that the liability of Government contractors is so "clear and substantial" an interest that this Court must step in lest state law does "major damage." *Yazell, supra,* at 352.

## A

The proposition that federal common law continues to govern the "obligations to and rights of the United States under its contracts" is nearly as old as *Erie* itself. Federal law typically controls when the Federal Government is a party to a suit involving its rights or obligations under a contract, whether the contract entails procurement, see *Priebe & Sons* v. *United States,* 332 U. S. 407 (1947), a loan, see *United States* v. *Kimbell Foods, Inc.,* 440 U. S. 715, 726 (1979), a conveyance of property, see *Little Lake Misere, supra,* at 591–594, or a commercial instrument issued by the Government, see *Clearfield Trust Co.* v. *United States,* 318 U. S. 363, 366 (1943), or assigned to it, see *D'Oench, Duhme & Co.* v. *FDIC,* 315 U. S. 447, 457 (1942). Any such transaction necessarily "radiate[s] interests in transactions between private parties." *Bank of America Nat. Trust & Sav. Assn.* v. *Parnell,* 352 U. S. 29, 33 (1956). But it is by now established that our power to create federal common law controlling the *Federal Government's* contractual rights and obligations does not translate into a power to prescribe rules that cover all transactions or contractual relationships collateral to Government contracts.

In *Miree* v. *DeKalb County, supra,* for example, the county was contractually obligated under a grant agreement with the Federal Aviation Administration (FAA) to "'restrict

the use of land adjacent to . . . the Airport to activities and purposes compatible with normal airport operations including landing and takeoff of aircraft.'" *Id.*, at 27 (citation omitted). At issue was whether the county breached its contractual obligation by operating a garbage dump adjacent to the airport, which allegedly attracted the swarm of birds that caused a plane crash. Federal common law would undoubtedly have controlled in any suit by the Federal Government to enforce the provision against the county or to collect damages for its violation. The diversity suit, however, was brought not by the Government, but by assorted private parties injured in some way by the accident. We observed that "the operations of the United States in connection with FAA grants such as these are undoubtedly of considerable magnitude," *id.*, at 30, and that "the United States has a substantial interest in regulating aircraft travel and promoting air travel safety," *id.*, at 31. Nevertheless, we held that state law should govern the claim because "only the rights of private litigants are at issue here," *id.*, at 30, and the claim against the county "will have *no direct effect upon the United States or its Treasury*," *id.*, at 29 (emphasis added).

*Miree* relied heavily on *Parnell, supra,* and *Wallis* v. *Pan American Petroleum Corp., supra,* the former involving commercial paper issued by the United States and the latter involving property rights in federal land. In the former case, Parnell cashed certain bonds guaranteed by the Government that had been stolen from their owner, a bank. It is beyond dispute that federal law would have governed the United States' duty to pay the value bonds upon presentation; we held as much in *Clearfield Trust, supra.* Cf. *Parnell, supra,* at 34. But the central issue in *Parnell,* a diversity suit, was whether the victim of the theft could recover the money paid to Parnell. That issue, we held, was governed by state law, because the "litigation [was] purely between private parties and [did] *not touch the rights and duties of the United States.*" 352 U. S., at 33 (emphasis added).

The same was true in *Wallis*, which also involved a Government contract—a lease issued by the United States to a private party under the Mineral Leasing Act of 1920, 30 U. S. C. § 181 *et seq.* (1982 ed. and Supp. IV)—governed entirely by federal law. See 384 U. S., at 69. Again, the relationship at issue in this diversity case was collateral to the Government contract: It involved the validity of contractual arrangements between the lessee and other private parties, not between the lessee and the Federal Government. Even though a federal statute authorized certain assignments of lease rights, see *id.*, at 69, 70, and n. 8, and imposed certain conditions on their validity, see *id.*, at 70, we held that state law, not federal common law, governed their validity because application of state law would present "no significant threat to any identifiable federal policy or interest," *id.*, at 68.

Here, as in *Miree*, *Parnell*, and *Wallis*, a Government contract governed by federal common law looms in the background. But here, too, the United States is not a party to the suit and the suit neither "touch[es] the rights and duties of the United States," *Parnell, supra*, at 33, nor has a "direct effect upon the United States or its Treasury," *Miree*, 433 U. S., at 29. The relationship at issue is at best collateral to the Government contract.[3] We have no greater power to displace state law governing the collateral relationship in the Government procurement realm than we had to dictate federal rules governing equally collateral relationships in the areas of aviation, Government-issued commercial paper, or federal lands.

That the Government might have to pay higher prices for what it orders if delivery in accordance with the contract ex-

---

[3] True, in this case the collateral relationship is the relationship between victim and tortfeasor, rather than between contractors, but that distinction makes no difference. We long ago established that the principles governing application of federal common law in "contractual relations of the Government . . . are equally applicable . . . where the relations affected are noncontractual or tortious in character." *United States* v. *Standard Oil Co.*, 332 U. S. 301, 305 (1947).

poses the seller to potential liability, see *ante*, at 507, does not distinguish this case. Each of the cases just discussed declined to extend the reach of federal common law despite the assertion of comparable interests that would have affected the terms of the Government contract—whether its price or its substance—just as "directly" (or indirectly). *Ibid.* Third-party beneficiaries can sue under a county's contract with the FAA, for example, even though—as the Court's focus on the absence of "*direct* effect on the United States or its Treasury," 433 U. S., at 29 (emphasis added), suggests— counties will likely pass on the costs to the Government in future contract negotiations. Similarly, we held that state law may govern the circumstances under which stolen federal bonds can be recovered, notwithstanding Parnell's argument that "the value of bonds to the first purchaser and hence their salability by the Government would be materially affected." Brief for Respondent Parnell in *Bank of America Nat'l Trust & Sav. Assn.* v. *Parnell,* O. T. 1956, No. 21, pp. 10–11. As in each of the cases declining to extend the traditional reach of federal law of contracts beyond the rights and duties of the *Federal Government,* "any federal interest in the outcome of the question before us 'is far too speculative, far too remote a possibility to justify the application of federal law to trans-actions essentially of local concern.'" *Miree, supra,* at 32– 33, quoting *Parnell,* 352 U. S., at 33–34.

### B

Our "uniquely federal interest" in the tort liability of affili-ates of the Federal Government is equally narrow. The im-munity we have recognized has extended no further than a subset of "officials of the Federal Government" and has cov-ered only "discretionary" functions within the scope of their legal authority. See, *e. g., Westfall* v. *Erwin,* 484 U. S. 292 (1988); *Howard* v. *Lyons,* 360 U. S. 593 (1959); *Barr* v. *Matteo,* 360 U. S. 564, 571 (1959) (plurality); *Yaselli* v. *Goff,* 12 F. 2d 396 (CA2 1926), aff'd, 275 U. S. 503 (1927) *(per curiam); Spalding* v. *Vilas,* 161 U. S. 483 (1896). Never be-

fore have we so much as intimated that the immunity (or the "uniquely federal interest" that justifies it) might extend beyond that narrow class to cover also nongovernment employees whose authority to act is independent of any source of federal law and that are as far removed from the "functioning of the Federal Government" as is a Government contractor, *Howard, supra,* at 597.

The historical narrowness of the federal interest and the immunity is hardly accidental. A federal officer exercises statutory authority, which not only provides the necessary basis for the immunity in positive law, but also permits us confidently to presume that interference with the exercise of discretion undermines congressional will. In contrast, a Government contractor acts independently of any congressional enactment. Thus, immunity for a contractor lacks both the positive law basis and the presumption that it furthers congressional will.

Moreover, even within the category of congressionally authorized tasks, we have deliberately restricted the scope of immunity to circumstances in which "the contributions of immunity to effective government in particular contexts outweigh the perhaps recurring harm to individual citizens," *Doe* v. *McMillan,* 412 U. S. 306, 320 (1973); see *Barr, supra,* at 572–573, because immunity "contravenes the basic tenet that individuals be held accountable for their wrongful conduct," *Westfall, supra,* at 295. The extension of immunity to Government contractors skews the balance we have historically struck. On the one hand, whatever marginal effect contractor immunity might have on the "effective administration of policies of government," its "harm to individual citizens" is more severe than in the Government-employee context. Our observation that "there are . . . other sanctions than civil tort suits available to deter the executive official who may be prone to exercise his functions in an unworthy and irresponsible manner," *Barr,* 360 U. S., at 576; see also *id.,* at 571, offers little deterrence to the Government contractor. On the other hand, a grant of immunity to Gov-

ernment contractors could not advance "the fearless, vigorous, and effective administration of policies of government" nearly as much as does the current immunity for Government employees. *Ibid.* In the first place, the threat of a tort suit is less likely to influence the conduct of an industrial giant than that of a lone civil servant, particularly since the work of a civil servant is significantly less profitable, and significantly more likely to be the subject of a vindictive lawsuit. In fact, were we to take seriously the Court's assertion that contractors pass their costs—including presumably litigation costs— through, "substantially if not totally, to the United States," *ante*, at 511, the threat of a tort suit should have only marginal impact on the conduct of Government contractors. More importantly, inhibition of the Government official who actually sets Government policy presents a greater threat to the "administration of policies of government," than does inhibition of a private contractor, whose role is devoted largely to assessing the technological feasibility and cost of satisfying the Government's predetermined needs. Similarly, unlike tort suits against Government officials, tort suits against Government contractors would rarely "consume time and energies" that "would otherwise be devoted to governmental service." 360 U. S., at 571.

In short, because the essential justifications for official immunity do not support an extension to the Government contractor, it is no surprise that we have never extended it that far.

## C

*Yearsley* v. *W. A. Ross Construction Co.*, 309 U. S. 18 (1940), the sole case cited by the Court immunizing a Government contractor, is a slender reed on which to base so drastic a departure from precedent. In *Yearsley* we barred the suit of landowners against a private Government contractor alleging that its construction of a dam eroded their land without just compensation in violation of the Takings Clause of the Fifth Amendment. We relied in part on the observation that the plaintiffs failed to state a Fifth Amendment claim

(since just compensation had never been requested, much less denied) and at any rate the cause of action lay against the Government, not the contractor. See *id.*, at 21 ("[T]he Government has impliedly promised to pay [the plaintiffs] compensation and has afforded a remedy for its recovery by a suit in the Court of Claims") (citations omitted). It is therefore unlikely that the Court intended *Yearsley* to extend anywhere beyond the takings context, and we have never applied it elsewhere.

Even if *Yearsley* were applicable beyond the unique context in which it arose, it would have little relevance here. The contractor's work "was done pursuant to a contract with the United States Government, and under the direction of the Secretary of War and the supervision of the Chief of Engineers of the United States, . . . as authorized by an Act of Congress." *Id.*, at 19. See also *W. A. Ross Construction Co.* v. *Yearsley*, 103 F. 2d 589, 591 (CA8 1939) (undisputed allegation that contractor implemented "stabilized bank lines as set and defined by the Government Engineers in charge of this work for the Government"). In other words, unlike respondent here, the contractor in *Yearsley* was following, not formulating, the Government's specifications, and (so far as is relevant here) followed them correctly. Had respondent merely manufactured the CH–53D helicopter, following minutely the Government's own in-house specifications, it would be analogous to the contractor in *Yearsley*, although still not analytically identical since *Yearsley* depended upon an actual agency relationship with the Government, see 309 U. S., at 22 ("The action of the agent is 'the act of the government'") (citation omitted), which plainly was never established here. See, *e. g.*, *Bynum* v. *FMC Corp.*, 770 F. 2d 556, 564 (CA5 1985). Cf. *United States* v. *New Mexico*, 455 U. S. 720, 735 (1982). But respondent's participation in the helicopter's design distinguishes this case from *Yearsley*, which has never been read to immunize the discretionary acts of those who perform service contracts for the Government.

526

## III

In a valiant attempt to bridge the analytical canyon between what *Yearsley* said and what the Court wishes it had said, the Court invokes the discretionary function exception of the Federal Tort Claims Act (FTCA), 28 U. S. C. § 2680(a). The Court does not suggest that the exception has any direct bearing here, for petitioner has sued a private manufacturer (not the Federal Government) under Virginia law (not the FTCA). Perhaps that is why respondent has three times disavowed any reliance on the discretionary function exception, even after coaching by the Court,[4] as has the Government.[5]

---

[4] "QUESTION: [Would it be] a proper judicial function to craft the contours of the military contractor defense . . . even if there were no discretionary function exemption in the Federal Tort Claims Act?

"MR. LACOVARA: I think, yes. . . . [I]t ought not to make a difference to the contractor, or to the courts, I would submit, whether or not the Government has a discretionary function exception under the Federal Tort Claims Act. . . .

"QUESTION: I think your position would be the same if Congress had never waived its sovereign immunity in the Federal Tort Claims Act. . . .

"MR. LACOVARA: That's correct. . . .

"QUESTION: Now wait. I really don't understand that. It seems to me you can make the argument that there should be preemption if Congress wanted it, but how are we to perceive that's what Congress wanted if in the Tort Claims Act, Congress had said the Government itself should be liable for an ill designed helicopter? Why would we have any reason to think that Congress wanted to preempt liability of a private contractor for an ill designed helicopter?

"QUESTION: . . . [Y]our preemption argument, I want to be sure I understand it—does not depend at all on the Federal Tort Claims Act, as I understand it. . . .

"MR. LACOVARA: That's correct." Tr. of Oral Arg. 33–35 (reargument Apr. 27, 1988).

[5] "QUESTION: Does the Government's position depend at all on the discretionary function exemption in the Federal Tort Claims Act?

"MR. AYER: Well, that's a hard question to answer. . . . I think my answer to you is, no, ultimately it should not." *Id.*, at 40–41.

Notwithstanding these disclaimers, the Court invokes the exception, reasoning that federal common law must immunize Government contractors from state tort law to prevent erosion of the discretionary function exception's *policy* of foreclosing judicial "'second-guessing'" of discretionary governmental decisions. *Ante*, at 511, quoting *United States* v. *Varig Airlines*, 467 U. S. 797, 814 (1984). The erosion the Court fears apparently is rooted not in a concern that suits against Government contractors will prevent them from designing, or the Government from commissioning the design of, precisely the product the Government wants, but in the concern that such suits might preclude the Government from purchasing the desired product at the price it wants: "The financial burden of judgments against the contractors," the Court fears, "would ultimately be passed through, substantially if not totally, to the United States itself." *Ante*, at 511.

Even granting the Court's factual premise, which is by no means self-evident, the Court cites no authority for the proposition that burdens imposed on Government contractors, but passed on to the Government, burden the Government in a way that justifies extension of its immunity. However substantial such indirect burdens may be, we have held in other contexts that they are legally irrelevant. See, *e. g.*, *South Carolina* v. *Baker*, 485 U. S. 505, 521 (1988) (our cases have "completely foreclosed any claim that the nondiscriminatory imposition of costs on private entities that pass them on to . . . the Federal Government unconstitutionally burdens . . . federal functions").

Moreover, the statutory basis on which the Court's rule of federal common law totters is more unstable than any we have ever adopted. In the first place, we rejected an analytically similar attempt to construct federal common law out of the FTCA when we held that the Government's waiver

of sovereign immunity for the torts of its employees does not give the Government an implied right of indemnity from them, even though the "[t]he financial burden placed on the United States by the Tort Claims Act [could conceivably be] so great that government employees should be required to carry part of the burden." *United States* v. *Gilman,* 347 U. S. 507, 510 (1954). So too here, the FTCA's retention of sovereign immunity for the Government's discretionary acts does not imply a defense for the benefit of contractors who participate in those acts, even though they might pass on the financial burden to the United States. In either case, the most that can be said is that the position "asserted, though the product of a law Congress passed, is a matter on which Congress has not taken a position." *Id.,* at 511 (footnote omitted).

Here, even that much is an overstatement, for the Government's immunity for discretionary functions is not even "a product of" the FTCA. Before Congress enacted the FTCA (when sovereign immunity barred any tort suit against the Federal Government) we perceived no need for a rule of federal common law to reinforce the Government's immunity by shielding also parties who might contractually pass costs on to it. Nor did we (or any other court of which I am aware) identify a special category of "discretionary" functions for which sovereign immunity was so crucial that a Government contractor who exercised discretion should share the Government's immunity from state tort law.[6]

Now, as before the FTCA's enactment, the Federal Government is immune from "[a]ny claim . . . based upon the exercise or performance [of] a discretionary function," including presumably any claim that petitioner might have brought against the Federal Government based upon respondent's negligent design of the helicopter in which Lt. Boyle died.

---

[6] Some States, of course, would not have permitted a stranger to the contract to bring such a tort suit at all, but no one suggested that this rule of state tort law was compelled by federal law.

There is no more reason for federal common law to shield contractors now that the Government is liable for some torts than there was when the Government was liable for none. The discretionary function exception does not support an immunity for the discretionary acts of Government *contractors* any more than the exception for "[a]ny claim [against the Government] arising out of assault," § 2680(h), supports a personal immunity for Government employees who commit assaults. Cf. *Sheridan* v. *United States, ante,* at 400. In short, while the Court purports to divine whether Congress would object to this suit, it inexplicably begins and ends its sortilege with an exception to a statute that is itself inapplicable and whose repeal would leave unchanged every relationship remotely relevant to the accident underlying this suit.

Far more indicative of Congress' views on the subject is the wrongful-death cause of action that Congress itself has provided under the Death on the High Seas Act (DOHSA), Act of Mar. 30, 1920, ch. 111, § 1 *et seq.*, 41 Stat. 537, codified at 46 U. S. C. App. § 761 *et seq.* (1982 ed., Supp. IV)—a cause of action that could have been asserted against United Technologies had Lt. Boyle's helicopter crashed a mere three miles further off the coast of Virginia Beach. It is beyond me how a state-law tort suit against the designer of a military helicopter could be said to present any conflict, much less a "'significant conflict,'" with "federal interests . . . in the context of Government procurement," *ante,* at 511, when federal law itself would provide a tort suit, but no (at least no explicit) Government-contractor defense,[7] against the same

---

[7] But cf. *Tozer* v. *LTV Corp.*, 792 F. 2d 403 (CA4 1986) (applying defense in DOHSA case), cert. pending, No. 86–674; *Shaw* v. *Grumman Aerospace Corp.*, 778 F. 2d 736 (CA11 1985) (same), cert. pending, No. 85–1529; *Koutsoubos* v. *Boeing Vertol, Division of Boeing Co.*, 755 F. 2d 352 (CA3) (same), cert. denied, 474 U. S. 821 (1985); *McKay* v. *Rockwell Int'l Corp.*, 704 F. 2d 444 (CA9 1983) (same), cert. denied, 464 U. S. 1043 (1984).

designer for an accident involving the same equipment. See Pet. for Cert. in *Sikorsky Aircraft Division, United Technologies Corp.* v. *Kloss*, O. T. 1987, No. 87–1633, pp. 3–6 (trial court holds that family of marine can bring a wrongful-death cause of action under the DOHSA against United Technologies for the negligent design of a United States Marine Corps CH–53D helicopter in which he was killed when it crashed 21 miles offshore), cert. denied, 486 U. S. 1008 (1988).

## IV

At bottom, the Court's analysis is premised on the proposition that any tort liability indirectly absorbed by the Government so burdens governmental functions as to compel us to act when Congress has not. That proposition is by no means uncontroversial. The tort system is premised on the assumption that the imposition of liability encourages actors to prevent any injury whose expected cost exceeds the cost of prevention. If the system is working as it should, Government contractors will design equipment to avoid certain injuries (like the deaths of soldiers or Government employees), which would be certain to burden the Government. The Court therefore has no basis for its assumption that tort liability will result in a net burden on the Government (let alone a clearly excessive net burden) rather than a net gain.

Perhaps tort liability is an inefficient means of ensuring the quality of design efforts, but "[w]hatever the merits of the policy" the Court wishes to implement, "its conversion into law is a proper subject for congressional action, not for any creative power of ours." *Standard Oil*, 332 U. S., at 314–315. It is, after all, "Congress, not this Court or the other federal courts, [that] is the custodian of the national purse. By the same token [Congress] is the primary and most often the exclusive arbiter of federal fiscal affairs. And these comprehend, as we have said, securing the treasury or the Government against financial losses *however inflicted* . . . ." *Ibid.* (emphasis added). See also *Gilman, supra,*

at 510–512. If Congress shared the Court's assumptions and conclusion it could readily enact "A BILL [t]o place limitations on the civil liability of government contractors to ensure that such liability does not impede the ability of the United States to procure necessary goods and services," H. R. 4765, 99th Cong., 2d Sess. (1986); see also S. 2441, 99th Cong., 2d Sess. (1986). It has not.

Were I a legislator, I would probably vote against any law absolving multibillion dollar private enterprises from answering for their tragic mistakes, at least if that law were justified by no more than the unsupported speculation that their liability might ultimately burden the United States Treasury. Some of my colleagues here would evidently vote otherwise (as they have here), but that should not matter here. We are judges not legislators, and the vote is not ours to cast.

I respectfully dissent.

JUSTICE STEVENS, dissenting.

When judges are asked to embark on a lawmaking venture, I believe they should carefully consider whether they, or a legislative body, are better equipped to perform the task at hand. There are instances of so-called interstitial lawmaking that inevitably become part of the judicial process.[1] But when we are asked to create an entirely new doctrine—to answer "questions of policy on which Congress has not spoken," *United States* v. *Gilman*, 347 U. S. 507, 511 (1954)—we have a special duty to identify the proper decisionmaker before trying to make the proper decision.

---

[1] "I recognize without hesitation that judges do and must legislate, but they can do so only interstitially; they are confined from molar to molecular motions. A common-law judge could not say I think the doctrine of consideration a bit of historical nonsense and shall not enforce it in my court. No more could a judge exercising the limited jurisdiction of admiralty say I think well of the common-law rules of master and servant and propose to introduce them here *en bloc*." *Southern Pacific Co.* v. *Jensen*, 244 U. S. 205, 221 (1917) (Holmes, J., dissenting).

When the novel question of policy involves a balancing of the conflicting interests in the efficient operation of a massive governmental program and the protection of the rights of the individual—whether in the social welfare context, the civil service context, or the military procurement context—I feel very deeply that we should defer to the expertise of the Congress. That is the central message of the unanimous decision in *Bush* v. *Lucas*, 462 U. S. 367 (1983);[2] that is why I joined the majority in *Schweiker* v. *Chilicky, ante,* p. 412,[3] a case decided only three days ago; and that is why I am so distressed by the majority's decision today. For in this case, as in *United States* v. *Gilman, supra:* "The selection of that policy which is most advantageous to the whole involves a host of considerations that must be weighed and appraised. That function is more appropriately for those who write the laws, rather than for those who interpret them." *Id.,* at 511–513.

I respectfully dissent.

---

[2] "[W]e decline to create a new substantive legal liability without legislative aid and as at the common law, because we are convinced that Congress is in a better position to decide whether or not the public interest would be served by creating it." 462 U. S., at 390 (internal quotation omitted).

[3] "Congressional competence at 'balancing governmental efficiency and the rights of [individuals],' *Bush,* 462 U. S., at 389, is no more questionable in the social welfare context than it is in the civil service context. Cf. *Forrester* v. *White,* 484 U. S. 219, 223–224 (1988)." *Ante,* at 425.