Harold Walter Pietz was injured when he fell during a rappelling exercise in ROTC.[1] *Page 157 
The carabiner used to secure the rope to Pietz and to slow his descent opened and caused him to fall rather than descend down the rope in a controlled manner. The carabiner was manufactured by Orthopedic Equipment Company (hereinafter "OEC"), a wholly-owned subsidiary of Biomet, Inc. Pietz sued OEC and Biomet under the Alabama Extended Manufacturer's Liability Doctrine ("A.E.M.L.D."); the trial court entered summary judgments for both defendants.
I believe the majority has incorrectly decided the issue of whether OEC and Biomet are shielded from liability by the government contractor defense set forth in Boyle v. UnitedTechnologies Corp., 487 U.S. 500, 108 S.Ct. 2510,101 L.Ed.2d 442 (1988).
The rationale behind the government contractor defense was set forth in Boyle as follows:
 "We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision [28 U.S.C. § 2680(a), part of the Federal Tort Claims Act]. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting 'second-guessing' of these judgments [citation omitted] through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs. To put the point differently: It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production. In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a 'significant conflict' with federal policy and must be displaced." 487 U.S. at 511-12, 108 S.Ct. at 2517-18.
In order for a government contractor to be shielded by this defense, the following test must be met:
 "Liability for design defects in military equipment cannot be imposed pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."
487 U.S. at 512, 108 S.Ct. at 2518.
The majority states that carabiners do not appear to be "military equipment." This statement results from what I believe is a misrepresentation of the evidence. The carabiners were designed by and ordered by the Army for use in military maneuvers and exercises by military personnel. Rappelling is an essential element of the deployment of troops from helicopters and over cliffs, rough terrain, and the sides of buildings. Certainly the carabiners were not being used by the military for recreational or industrial purposes; therefore, I believe the majority errs in suggesting that the carabiner was not "military equipment." To say that "military equipment" included only such equipment as was actually used to fire some sort of ordnance fails to follow the test set out in Boyle.
In fact, it is clear from the record that OEC met all three parts of the test in Boyle. As to part (1), the specifications for the carabiners came from the Government; OEC had never manufactured carabiners before, and all the specifications were supplied *Page 158 
to it by the Government. The only design change made by OEC was a change it requested in the specifications to allow it to use a superior metal alloy in the manufacture of the carabiners; the Government approved this change, a change that had nothing to do with Pietz's injury.
This is not a case where the contractor provided all the specifications to the Government and the Government then merely "rubber stamped" the specifications, as was the situation inTrevino v. General Dynamics Corp., 865 F.2d 1474 (5th Cir.), cert. denied, ___ U.S. ___, 110 S.Ct. 327 (1989). Here, the Government did more than approve "reasonably precise specifications" — it provided them.
The majority unfortunately justifies its holding by saying that there was no evidence that the Government considered a locking device for the carabiner. That has nothing to do with anything in this case. The Government is not the defendanthere, and the issue, according to Boyle, is whether the Government approved reasonably precise specifications, which the Government obviously did in this case. The question of whether the Government should have, or could have, considered other designs is totally immaterial; it is not an issue.
Concerning the second element of the test, there is no evidence that the carabiner in question or any of the other carabiners were manufactured other than pursuant to the specifications provided by the Government. All the evidence indicates that OEC manufactured the carabiners to specification and that the Government accepted them and acknowledged that they met specifications.
As to the third part of the test, all the evidence indicated that OEC had no knowledge of any danger in the use of the carabiners that the Government itself did not have. The majority says that there is a genuine question of whether OEC informed the Government about design defects related to safety. Again, the majority misinterprets the record, for it shows that there was no evidence that OEC knew of any design defectsrelated to safety, and there was no evidence that OEC had knowledge about carabiners, their use, and their safety that the Government did not already have. As mentioned above, OEC had never made carabiners before, and its employees had only a general knowledge of what they were to be used for — mountain climbing. Yet it is clear that the military had extensive knowledge of the use of carabiners. Indeed, because the military supplied the specifications for the carabiners, it is clear that the Government had knowledge about their uses and their dangers. Pietz contends that the carabiners would have been safer with a screw-down locking device on the gate part; the evidence showed that the military used carabiners both with and without the locking device. Clearly, the decision to use nonlocking carabiners is the type of discretionary function protected by 28 U.S.C. § 2680(a) and the government contractor defense.
I am absolutely convinced that the defendants in this case met the test in Boyle and are protected from liability under the A.E. M.L.D., and that the learned trial judge was eminently correct.
The rationale for the government contractor defense is to prevent what is, in effect, indirect lawsuits such as this against the Federal Government based upon its discretionary function of selecting military equipment; the costs of suits against contractors will only be passed on to the Government. The majority's opinion has the effect of allowing plaintiffs to sue the Federal Government in a state court.
Even if the Boyle defense was not controlling, the majority's opinion is incorrect, because Pietz was contributorily negligent, as a matter of law. The record shows that there were locking carabiners available at the ROTC exercise site. There were also "figure eight" rings at the site; these are solid devices shaped like the number "8" and are used in rappelling to hold the rope, and, being solid, they cannot open. Despite his knowledge that the locking carabiners and the "figure eight" rings were there, Pietz intentionally decided to use thenonlocking variety of carabiner when attaching himself to therope. Pietz stated *Page 159 
that he "didn't see any need for" the locking carabiner, even though other students had used one. Pietz's deposition shows that he was knowledgeable in rappelling because he had rappelled many times; he had started rappelling when he was in the eighth grade, and he had been trained in rappelling by the Civil Air Patrol and by the ROTC.
I would affirm the judgment of the trial court. Therefore, I dissent.
STEAGALL, J., concurs.
[1] To rappel, Pietz assembled a web seat and hooked the seat together with a carabiner; he looped an anchored rope through another carabiner and attached that carabiner to the one hooked to his web seat. The friction of the rope through the second carabiner slows the descent of the person rappelling; there are other devices that serve the function of slowing the movement of the rope. These include locking carabiners and "figure eight" rings.