Diann TATE, Individually on her own behalf as surviving spouse of Dale Tate, as Personal Representative of the Estate of Dale Tate, deceased and as Natural Guardian of Jason Tazwell Tate, a minor child of Dale Tate; and Brian William Tate, individually, on his own behalf as surviving child of Dale Tate, et al, Plaintiffs,

v.

BOEING HELICOPTERS, an Unincorporated Division of The Boeing Company, a Delaware Corporation, and Breeze–Eastern, an Unincorporated Division of Transtechnology Corporation, a Delaware Corporation, Defendants.

Civ. A. Nos. 91–0305–P–J, 91–0306–P–J.

United States District Court,
W.D. Kentucky.

March 6, 1996.

ald A. McIntire, Michelle M. Seery, Perkins Coie, Los Angeles, CA, for Boeing Helicopters.

Carol D. Browning, John Lewis Tate, Lively M. Wilson, Stites & Harbison, Louisville, KY, Thomas F. Daly, McCarter & English, Newark, NJ, Bruce G. Shanahan, Jacques E. Soiret, Kirtland & Packard, Los Angeles, CA, for Breeze Eastern.

## MEMORANDUM OPINION

JOHNSTONE, Senior District Judge.

The United States Court of Appeals for the Sixth Circuit vacated a summary judgment granted these defendants [1] on a failure to warn claim. It held that the "government contractor defense is not necessarily established merely by satisfying the government contractor defense conditions as to design defect claims." *Tate, et al, v. Boeing Helicopters, et al,* 55 F.3d 1150, 1157 (6th Cir. 1995). The opinion observed: 1) the trial court did not decide whether a genuine issue of material fact exists regarding the applicability of the government contractor defense as applied to the failure to warn claim, and 2) the trial court did not determine whether Kentucky tort law imposes a duty to warn under the facts of this case. *Id.* at 1157. In the opinion the Court of Appeals suggested that on remand this court might elect to assume that Kentucky law would impose liability under these facts and proceed to determine the propriety of summary judgment based on the government contractor defense. It further suggested that this court expand the record on the failure to warn claim. *Id.* at 1157–58. Having considered the matters on remand, the defendants' renewed motions for summary judgment are granted, and plaintiffs' motion for summary judgment is denied.

## I. Background

Because the facts of this case have been related by this court in a Memorandum Opinion dated May, 13, 1993 and by the Court of Appeals in *Tate, et al, v. Boeing Helicopters,*

Francis G. Fleming, Kreindler & Kreindler, New York City, Lucius P. Hawes, Jr., Hawes & Cameron, Hopkinsville, KY, Mark A. Rassas, Rassas & Rassas, Clarksville, TN, for plaintiffs.

John F. Lynch, Jr., Carpenter, Bennett & Morrissey, Newark, NJ, Richard L. Walter, Boehl, Stopher & Graves, Paducah, KY, Steven S. Bell, Perkins Coie, Seattle, WA, Ron-

---

1. For purposes of this Memorandum Opinion, the court will address both Boeing's and Breeze– Eastern's motions as one, as they are virtually identical in content.

*et al,* 55 F.3d 1150 (6th Cir.1995), it would be repetitious to restate them here.

■ In the *Tate* opinion, the Court of Appeals defined the test for applicability of the government contractor defense in the failure to warn context. The test consists of three prongs that parallel the test in *Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).[2]

> When state law would otherwise impose liability for a failure to warn of dangers in using military equipment, that law is displaced if the contractor can show: (1) the United States exercised its discretion and approved the warnings, if any; (2) the contractor provided warnings that conformed to the approved warnings; and (3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not.

*Id.* at 1157. Thus, an analysis of the defendants' government contractor defense on the failure to warn claim under the refined standard is appropriate. For purposes of this discussion, we will assume that Kentucky tort law would impose liability on these defendants for failure to warn.

## II. Analysis

### A. "Significant Conflict" Between Federal Interest and State Law

The initial question raised concerns plaintiffs' contention that there is no *Boyle* defense available to the defendants because the *Boyle* decision, as recognized by the Court of Appeals in *Tate,* imposes a *threshold requirement* of "significant conflict" between 1) state law imposing liability for failure to warn and 2) a federal interest. *Tate* at 1157. They contend that this court must find such a conflict exists before it can even reach the three-element tests of *Boyle* or *Tate.* Plaintiffs maintain the federal interest to be protected is "the Army's desire to provide its flight crews with CH–47D Operator's Manuals that address 'all mission

equipment malfunctions which constitute a safety hazard during operation' " as required by the military specifications incorporated into the contract. The contract required Boeing to prepare, review, validate and deliver new manuals, to be prepared in accordance with military specification MIL–M–63029B(AV). This specification requires that a contractor shall

> cover all mission equipment malfunctions that constitute a safety hazard during operation. Emergency procedures will be outlined as in Section I and shall include corrective action to be taken. Mission equipment shall include . . . cargo systems.

The plaintiffs believe that the federal interest is in having contractors conform to the specifications set forth in the contract. Plaintiffs insist that there is clearly no conflict between these contractual requirements and the state law duty to warn of dangers in using the tandem cargo hook system. The contractor could comply with both its contractual obligations to provide warnings and the state prescribed duty to warn. Therefore, because no conflict is present, it is impossible for defendants to prevail on this defense as a matter of law.

The defendants respond that "significant conflict" is not a fourth prong of the *Boyle* test, but rather that "significant conflict" is part of the *Boyle* test, not a prerequisite. It should be considered in conjunction with the first prong of that test, whether there has been approval by the United States of reasonably precise specifications. *Lewis v. Babcock Industries, Inc.,* 985 F.2d 83, 86 (2d Cir.1993), *cert. denied,* 509 U.S. 924, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993). We note that the *Tate* court considered the "significant conflict" issue in its analysis of whether the United States exercised its discretion and approved the warnings. *Tate* at 1154.

Although plaintiffs ask the court to assume that the federal policy or interest in question is whatever happens to be in the terms of the

---

**2.** The *Boyle* Court stated:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (a) the United States approved reasonably precise specifications; (b) the equip-

> ment conformed to those specifications; and (c) the supplier warned the United States about dangers in the use of the equipment known to the supplier but not to the United States.
> *Boyle* at 512, 108 S.Ct. at 2518.

contract, we must follow the rationale utilized by the *Tate* court:

> The *Boyle* Court held that, under certain circumstances, government contractors are immune from state tort liability for design defects in military equipment. This defense was created to protect the "uniquely federal interest" that is involved where state tort law imposes liability on government contractors for design defects: "either the contractor will decline to manufacture the design specified by the Government, or it will raise its price." *Boyle* at 507, 108 S.Ct. at 2516. The existence of a uniquely federal interest does not, however, alone justify "displacement" of state law. *Id.* There must also exist a " 'significant conflict' " between the federal interest and the application of state law. *Id.* [citations omitted].

In matters of liability claims arising from government procurement contracts, a "significant conflict" could arise between state tort law and the federal interest in immunizing the federal government from liability for performing a "discretionary function," an act for which the government may not be sued under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a). *Id.* at 511, 108 S.Ct. at 2518. Selecting the design of military equipment surely is a discretionary function: "It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." *Id.* If government contractors were held liable for defects in designs approved by the government, then the discretionary function exemption would afford little protection to the government; the contractors would simply pass through the tort liability to the government via higher contract prices. *Id.* at 511–12, 108 S.Ct. at 2518–19. Thus, state tort law could frustrate the federal interest in permitting the government to exercise discretion in choosing military equipment designs.

*Id.* at 1153. It is clear that the federal interest to be weighed is *not* defined by the terms of the contract; rather, when the government contracts with a manufacturer for the production of military equipment, the federal interest to be protected is that of allowing the United States to exercise its discretion in approving designs and warnings for that equipment. The government must have this discretion, especially in military matters. This interest conflicts with state tort law liability in that it subjects the United States to practical and. financial hardship when its suppliers are held to state tort liability for designs and warnings the government approved. As the *Tate* and *Boyle* courts noted, this tort liability is inevitably passed on to the United States, who will have to pay a higher price for the equipment or maybe not get it at all.

The inquiry into "significant conflict" occurs during the analysis of the first prong of *Boyle* or *Tate*, and it is not a separate or threshold issue. Because the first prong of these tests requires the exercise of government discretion, state tort law necessarily conflicts with the government's interest in preserving the benefits of that discretion. "By satisfying this element, the contractor establishes that a conflict exists between state law which imposes liability and the duty imposed by the government contract." *Lewis* at 86. When the United States exercises its discretion in approving a warning or design, then a state law that would impose tort liability on a manufacturer for that warning or design is in significant conflict with the government's interest in exercising that discretion.

## B. The *Tate* Government Contractor Defense

The plaintiffs term their theory of causation as "sling hang-up." The sling hang-up theory proposes that the tandem cargo hook system caused a dragging load to hang up on an open hook, thus creating too much tension in the sling for it to release.[3] The Court of Appeals stated in its 1995 *Tate* decision that

---

**3.** Plaintiffs submit the affidavits of CWO Bert Steele, a former CH–47D pilot, Army Aviation Accident Investigator and Safety Officer, and LTC Loel Ewart, also a former CH–47D pilot and Master Army Aviator, in support of this proposition.

the cause of the accident was "sling slack."[4] Plaintiffs maintain that sling hang-up is a completely different problem from sling slack. While claiming that the defendants failed to make a prima facie case for the government contractor defense under the sling slack theory (because of the lack of "significant conflict"), plaintiffs also claim that there is a genuine issue of material fact as to whether the Army exercised discretion in regard to warnings addressed to the sling hang-up problem.

Whether characterized as "sling slack" or "sling hang-up," the undisputed cause of the accident was the failure of the tandem cargo hook system to release the cargo. The only relevant inquiry, then, is whether the defendants adequately warned of the situations in which the hooks could fail to release.

Although there is no specific warning in the CH–47D's operations manual concerning sling hang-up, the absence of warnings pertaining to this particular problem is irrelevant. The essence of plaintiffs' argument is that in order for defendants to be entitled to the government contractor defense, defendants must show 1) that they proposed an actual warning concerning every potential problem with the tandem hook cargo system, and 2) that the government, upon being made aware of all potential problems, rejected that warning. Defendants are not, as plaintiffs contend, obligated to propose actual warnings concerning every potential problem with a specific design feature, nor are they required to show that such proposed warnings were considered by the Army and rejected. The obligations of the defendants to warn are guided solely by the three-pronged tests of *Tate* and *Boyle*. Defendants need only show that the government exercised its discretion and approval of warnings concerning potential problems of which the contractor and the government knew. Because we reject the plaintiffs' argument as to the applicability of the *Tate* test, their argument need not be discussed at length. The focus of this discussion shall be whether the defendants

are entitled to summary judgment based on the government contractor defense to plaintiffs' failure to warn claims under *Tate*.

### 1. Government Discretion and Approval of Warnings

The *Tate* test for applicability of the government contractor defense first requires a showing that the United States has exercised its discretion and approved the warnings, if any. *Tate* at 1157. Only government *discretion*, not dictation or prohibition of warnings is required. *Id.* As this test is designed to closely track the *Boyle* test for design defect claims, it follows from *Boyle* that in failure to warn cases the defendants are only required to show that a "continuous back and forth" exchange took place with regard to the warnings. *Id.* Here, the defendants have made this showing.

Warnings pertaining to sling slack were included in the prototype YCH–47D Operator's Manual as early as 1979, and continued into the CH–47D Operator's Manual since its issuance in 1982. In 1979, a Boeing pilot suggested the following "CAUTION" be inserted into the Operator's Manual:

> The forward and aft hooks may fail to open if the slings are slack when the release solenoids are energized (a minimum load of 16 lb. Is required for opening). The hooks can be opened by selecting the desired hook(s) and depressing the release switch as the aircraft is lifted to take tension on the slings.

This CAUTION was approved and inserted verbatim into the Operator's Manual. Chapter Nine, "Emergency Procedures" of the YCH–47D Operator's Manual also included instructions on procedures for remedying the sling slack problem. The following CH–47D Operator's Manual contains the same warnings as provided in the YCH–47D Operator's Manual, but the emergency procedures are now contained in three places rather than two. Furthermore, a "NOTE" was added to the Cargo Hooks Operational Checks section

---

**4.** The Court of Appeals' summary of plaintiffs' causation theory stated:

> The plaintiffs claim that the forward sling remained [on the hook] because there was insufficient tension in that sling to pull the hook's hinged load beam downward. The concrete block was resting on the ground, so the sling was slack.
> *Tate* at 1152.

of the CH–47D Operator's Manual which stated:

> The forward and aft hooks will not open unless a force is applied. As long as one of the CARGO HOOK RELEASE switches are pressed, the forward and aft hooks will make a sound like a machine gun firing. This sound indicates the hooks are operating normally.

Finally, the Normal Operation of Cargo Hooks section of the CH–47D Operator's Manual provided the following language:

> Loads-check released. If the forward or aft hooks did not open because of sling slack, press the release switch and lift the helicopter to apply a strain to the sling and pull the hooks open.

Regarding other situations which may cause a load not to release, Boeing provided the Army with a Hazard Analysis in 1977 that warned that the cargo might not release if it dragged on the ground.

It is undisputed that the Operator's Manual for the CH–47D was the product of continuous discussion, review, updating and revision by both Boeing and the Army. The manual was a living document, subject to years of continuous development. Defendants' affidavits support the contention that the Army was all but immersed in the development of every aspect of the Operator's Manual. The Army made several independent evaluations of the preliminary draft of the manual for the CH–47D's predecessor, the YCH–47D, beginning in the late 1970s. Furthermore, the manual's final draft was subject to several months of in-process reviews by Government representatives. The in-process reviews were formal affairs in which the manuals were reviewed by Army representatives in extreme detail. The Army retained the last word regarding what language was included in the manual. Often the Army made changes without consulting Boeing. Even after Boeing delivered the final copies of the manual to the Army, Boeing retained copies for possible further revision upon the completion of the Army's testing of the YCH–47D aircraft. The manual was in fact subsequently revised numerous times at the direction of the Army. When the Army again contracted with Boeing in 1980 to begin production for modernizing the aircraft, Boeing was required to also modernize and update the manual. Again, in-process reviews were held by Army representatives. Following the numerous revisions, Boeing delivered the final copies of the Army-approved CH–47D Operator's Manual, along with the negatives of the manual so that the Army could print copies as needed. The process for creating the new CH–47D Operator's Manual took one and a half years, even with the baseline YCH–47D Operator's Manual already in existence.

The Army's approval of the content of the Operator's Manual, including the warnings, cannot be said to be "rubber stamping." As the *Tate* court noted,

> And where the government goes beyond approval and actually determines for itself the warnings to be provided, the Contractor has surely satisfied the first condition because the government exercised its discretion.

*Id.* at 1157. Defendants are entitled to summary judgment on the first prong of the government contractor defense.

### 2. Conformity to the Approved Warnings

The second prong of the *Tate* test requires that the contractor provide warnings that conform to the approved warnings. *Id.* at 1157. The defendants have *necessarily* made the requisite showing. This is not a situation in which the defendants prepared and distributed warnings to end users without the involvement of the government, and those warnings could then be compared to a standard or model warning previously approved by the government. Here, the defendants' warnings to end users are contained in the very document approved by the government, the CH–47D Operator's Manual. Thus, the warnings not only conform to approved warnings, but they are *identical* because they are one in the same. Defendants further point out that the Army executed a DD250 "Material Inspection and Receiving Report" which documented the Manual's conformance to all applicable specifications. Therefore, the defendants are entitled to summary judgment on the second prong of the government contractor defense.

### 3. Warning the United States of Dangers in Equipment Use

The third prong of the *Tate* test requires the defendants to show that they warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not. *Id.* at 1157. This is identical to the third prong of the *Boyle* test for the government contractor defense in design defect cases, and the issue has already been decided as a matter of law by this court and the Court of Appeals. The *Tate* court stated:

> [T]he Army was aware of all the dangers of which the contractors were aware. In September of 1977, the Army itself tested tandem cargo hooks attached to a YCH–47C/D, and concluded that cargo should be loaded "so that tension is maintained on the aft hook which facilitates releasing the load." In November 1977, Boeing presented the Army with a Hazard Analysis that warned that the cargo might not release if it dragged on the ground. Also, the Army's 1982 CH–47D manual warned that "[t]he forward and aft hooks may fail to open if the slings are slack when the release solenoids are energized (a load of 18 to 22 pounds is required for opening)." The manual also explained how a pilot might successfully release the cargo if a first attempt failed due to sling slack. Hence the third condition of *Boyle* has been met.

*Tate* at 1156. As the *Tate* court noted, Boeing made the Army aware of the situations in which a load may fail to release. In view of this holding, the defendants are entitled to summary judgment on the third prong of the government contractor defense.

### III. Conclusion

There is no genuine issue as to any material fact concerning the plaintiffs' failure to warn claim. The defendants have shown they are entitled to summary judgment as a matter of law on the basis of the government contractor defense. An appropriate Order denying plaintiffs' motion for summary judgment and sustaining defendants' motions for summary judgment has been entered.