The **TORRINGTON COMPANY** and **Ingersoll–Rand Corporation,** **Appellants,**

v.

Sharon **STUTZMAN, et al., Appellees.**

No. 09–97–059 CV.

Court of Appeals of Texas, Beaumont.

Submitted on Jan. 15, 1998.

Decided Feb. 25, 1999.

---

Roger Townsend, Richard P. Hogan, Jr., Jennifer Bruch Hogan, Kevin H. Dubose, David W. Holman, Holman Hogan Dubose & Townsend, L.L.P., Houston, Donald O. Collins, William J. Joyce, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P., New Orleans, LA, William M. Tolin, III, Benckenstein & Oxford, L.L.P., Beaumont, William Powers, Jr., Austin, for appellants.

Ernest H. Cannon, Ernest Cannon & Associates, Houston, Gilbert I. Low, David J. Fisher, Greg C. Wilkins, Orgain, Bell & Tucker, L.L.P, Beaumont, W.T. Womble, JoAnn Storey, Tracy J. Willi, Womble & Waters, King Waters, Waters & Waters, Houston, David W. Ledyard, Strong, Pipkin, Nelson, Bissell & Ledyard, L.L.P., Beaumont, Michael Fredette, Shell Oil Company, Houston, Justin L. Williams, Clay E. Coalson, Patrick S. Martin, Meredith, Donnell & Abernathy, Corpus Christi, for appellees.

Before WALKER, C.J., BURGESS and FARRIS, JJ.*

## OPINION

DAVID FARRIS, Justice (Assigned).

This is a wrongful death case brought by the survivors of Phillip D. Stutzman and James Pulaski, two Marines who were killed in a 1992 helicopter crash. The crash was caused by a failed bearing. The appellees sued several defendants, but the appellants, Ingersoll–Rand and its subsidiary The Torrington Company (collectively, Ingersoll), were held to be jointly and severally liable for the entire judgment. The judgment was based upon a jury award of actual damages of $35,765,000.00 and punitive damages of $50,000,000.00. After remittitur, actual damages were reduced to $29,000.000.00 and punitive damages were reduced to $5,000,000.00. Ingersoll raises fourteen points of error.

Fafnir Bearing, a division of Textron, Inc. (Textron) manufactured –5 bearings [1] for use in helicopters manufactured by Bell Helicopter, a division of Textron. Four –5 bearings were used in a hanger assembly to support the helicopter's tail rotor drive shaft. In addition to providing –5 bearings to Bell, Fafnir sold them directly to the military as replacements. Significantly, the –5 bearing was greased

---

\* The Honorable David Farris, sitting by assignment pursuant to Tex.Gov't Code Ann. § 74.003(b) (Vernon 1988).

1. The bearing was assigned part number 623–5 by Bell Helicopter, a division of Textron, Inc., for use in the hanger assembly of a UH–1N helicopter made for the military. Throughout the record and in the parties' briefs it is referred to as a "–5" or "dash 5" bearing.

during manufacture with Mobil 28 grease and permanently sealed; thus, it was not possible to regrease a –5 bearing. Fafnir manufactured the failed –5 bearing before 1985.

In 1985 Ingersoll acquired the assets of Fafnir Bearing and created Fafnir Torrington, a division of the Torrington Company, to manufacture –5 bearings as well as other bearings used in the manufacture and maintenance of helicopters. Under the purchase agreement Ingersoll generally agreed to assume and discharge all obligations of Textron and to indemnify Textron for product liability suits and other civil claims involving Textron's operation of Fafnir. In 1988 Ingersoll moved Fafnir from New Britain, Connecticut to Newington, Connecticut where it continued to manufacture –5 bearings for sale to the military.[2] In Newington, the process used in manufacturing the bearings was the same as that employed at New Britain; although, for the first time, serial numbers were imprinted on the bearings.

The Navy had stored the failed –5 bearing for more than five years before installing it in a hanger assembly. It was installed in one helicopter and used for four hundred and forty-four hours. It was removed from the first helicopter and placed in the crashed helicopter where it was used ninety-eight hours before it failed.

The appellees contend that the –5 bearing failed because it was contaminated when it was manufactured or because the Mobil 28 grease, within the bearing, was too old. The appellees contend that Textron was negligent and that the –5 bearing had design, manufacture, and marketing defects. The appellees also contend that Ingersoll was negligent in failing to warn the Navy that the –5 bearings had a shelf life limited by the grease used in manufacturing the bearing and also negligent in not recalling the –5 bearings or warning the Navy of possible contamination.

The parties called several expert witnesses. While the witnesses generally agreed that the crash was caused by the failure of a bearing, they disagreed why the bearing failed. The witnesses offered varied explanations for the bearings failure involving the failure of old grease, contamination of the bearing, or misalignment of the hanger assembly.

The jury found that the negligence of both Fafnir Bearing Company (Textron) and Ingersoll proximately caused the crash. The jury also found the –5 bearing had design, manufacturing, and marketing defects all of which were producing causes of the crash. The jury assessed one percent of causation to Textron and ninety-nine percent to Ingersoll. In a separate bench trial the trial court found that Ingersoll was bound by contract to indemnify Textron for liability caused by the failed bearing.

 Ingersoll's fourth and fifth points challenge the legal and factual sufficiency of the evidence to support jury findings establishing its liability and Textron's liability. The litany of authority ordaining the applicable standards of review is well known. In sum, we may sustain a no evidence point only when the record discloses either: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *See Juliette Fowler Homes, Inc. v. Welch Assocs.*, 793 S.W.2d 660, 666 n. 9 (Tex.1990) (citing Robert W. Calvert. *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex.L.Rev. 361, 362–63 (1960)). To sustain a factual sufficiency point we must clearly state why the evidence supporting the challenged finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust, why it shocks the con-

---

**2.** There was evidence that in 1992 Ingersoll sold 40,000 –5 bearings to the military.

science, or why it clearly demonstrates bias. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986)(op. on reh'g).

■ In point of error five, Ingersoll challenges the legal and factual sufficiency of the evidence to support the finding of Textron's liability. We overrule point five because, after applying the appropriate standards of review, we find there was legally and factually sufficient evidence of grease failure and bearing contamination supporting the findings of liability attributed to Textron.

Evidence of Textron's liability included proof that it had failed to take into account that Mobil 28 grease had a limited life expectancy, a fact not disputed by any witness. John Doner with Mobil testified his company gave Mobil 28 a three year shelf life. Roy Battles, a design engineer for Textron's Bell Helicopter, testified that Mobil reported to Bell and Fafnir that Mobil 28 grease sealed in its original container had a three year shelf life. Michael Buchanan, a helicopter pilot and mechanic, testified that the age of the grease and metal contamination from the manufacturer caused the bearing to fail. James Craddock, a consulting engineer who had testified in twenty-five to fifty cases involving bearings, described the age of the grease as a factor contributing to the bearing failure. Craddock opined that the –5 bearings were an unreasonably dangerous product because an age critical material, Mobil 28 grease, was sealed in the bearings with no way to track the life history or expectancy of the bearing. Ingersoll's witness, David Stanley, testified that a failure to have an effective retirement program for bearings contributed to the accident, and that an effective retirement program was not possible without serializing the bearings.

There was also evidence the bearing was contaminated during manufacture. The testimony of Buchanan and Craddock that contamination contributed to the failure was based in part upon the appearance of the remnants of the failed bearing. Crad-

dock described how galling present on the bearing remnants indicated something was rubbing inside the bearing and concluded metal shavings sealed within the bearing contributed to its failure. Craddock's opinion was based in part upon his knowledge of a prior history of contaminated –5 bearings. Thomas Eagar, a metallurgist called as a witness by Bell, testified that "spalling" described by other witnesses was consistent with corrosion and inconsistent with misalignment as proposed by Ingersoll. Doner noted the presence of sulphur contaminating the grease of the other –5 bearings on the crashed helicopter and testified that Mobil 28 did not contain sulphur.

■ Under point of error four Ingersoll contends the only finding against it was based upon negligence, and the proof failed because it neither owed nor breached a duty and did not cause the crash. Ingersoll contends it owed no duty because Texas imposes no post-sale duty unless the manufacturer retains or regains control over the product. In support of this assertion Ingersoll cites two federal cases, *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*, 844 F.2d 1174, 1185 (5th Cir.1988); *Syrie v. Knoll Int'l*, 748 F.2d 304, 311 (5th Cir.1984). Notably, *Arkwright–Boston* cited *Syrie*, *Arkwright* 844 F.2d at 1185, while *Syrie* relied upon *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). *Syrie* at 311. In *Bradshaw* the court recognized that a manufacturer could assume a duty to improve a product, after sale. *Id.* at 532. *See also Dion v. Ford Motor Co.*, 804 S.W.2d 302 (Tex.App.—Eastland 1991, writ denied).

In part, appellees respond to Ingersoll's denial of any duty by arguing that Ingersoll assumed a duty to the United States as a consequence of its assumption of Textron's contractual obligations and its special relationship as the United States' sole supplier of the –5 bearings. We overrule

point four because there was legally and factually sufficient evidence that Ingersoll assumed a duty to assure that –5 bearings, manufactured by Fafnir, could be safely used in helicopter tail rotor drive shafts and wrongly represented to the United States that –5 bearings had a five year shelf life.

From 1985 when it acquired Fafnir until after the fatal crash, Ingersoll encouraged Bell Helicopter, Textron and the United States to continue to rely upon Fafnir. In August 1989, Fafnir's engineering manager wrote Bell recommending the regreasing or reinspection of bearings after five years. At the same time Fafnir recognized that grease "in the can" should be used in two years. Also in 1989 a Fafnir representative in a telephone conversation with a representative of the United States vouched for the –5 bearing asserting it was "fine tuned" for its intended use. Documents introduced into evidence by appellees demonstrated that both Bell and the United States were concerned about the quality of Fafnir bearings. Their concern was in response to the failure of a different Fafnir bearing, a –3 bearing, also used to help support tail rotor drive shafts; however, this concern also involved the –5 bearing. There was also concern that Fafnir bearings were contaminated and that their shelf life had expired. Fafnir responded to these expressions of concern by criticizing Bell's findings related to the 1991 crash and asserting that it would actively participate in investigating the cause of the crash. Ingersoll witnesses testified that, despite its representations and responses, Fafnir never had a grease life policy and could not explain its assertion to the military of a five year shelf life.

■ In its first point of error, Ingersoll contends the court erred in apportioning peremptory challenges. In large part Ingersoll's contention is based upon appellees' trial presentation which was directed more toward proving Ingersoll's culpability than Textron's. Ingersoll does not explain how the court should have anticipated how the appellees would present their proof. Ingersoll also points to the appellees', Mobil's and Textron's exercise of peremptory challenges as confirming the error in apportioning strikes; this is something else that would not have been known to the court until after the apportionment of strikes. After voir dire, Ingersoll pointed out to the court that another defendant, Mobil, had suggested to the jury panel that either Bell or Fafnir was at fault and argued that this was proof of antagonism. In its motion to realign strikes, Ingersoll pointed to thirteen categories of pretrial occurrences or things that did not occur as proof of no antagonism between appellees and other defendants. Without addressing these categories separately, we note that their value as proof no antagonism existed is thin at best. Apparently, Ingersoll did not suggest to the court what ratio of strikes it thought was appropriate.

■■ The nature and degree of antagonism between parties and its effect on the allotment of strikes are matters left to the trial court's discretion. *See Diamond Shamrock Corp. v. Wendt,* 718 S.W.2d 766, 769 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). Our review of the trial court's allocation of strikes is limited to the information available to the court when it decides that question. *See American Cyanamid Co. v. Frankson,* 732 S.W.2d 648, 660 (Tex.App.—Corpus Christi 1987, writ ref'd). After reviewing the record we find no abuse of discretion. Point one is overruled.

■ In its sixth point of error Ingersoll complains of the admission of evidence concerning the 1991 helicopter crash. Ingersoll objected to evidence of the earlier crash as irrelevant. Admissibility of evidence lies within the sound discretion of the trial court. *See City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). Relevant evidence includes any evidence that tends to make the existence of any fact of consequence more or less probable. *See* Tex.R.Civ.Evid. § 401. We overrule

point six because evidence of the 1991 crash was relevant to the issue of Ingersoll's negligence as discussed in our disposition of point four.

■ In its seventh point of error Ingersoll contends, in part, it established a government contractor or *Boyle* defense as a matter of law. *See Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). Alternatively, Ingersoll contends the trial court erred in refusing to charge the jury on government contractor defense. We overrule both contentions because the evidence was conclusive that the United States did not exercise its discretion over the design of the bearing.

■ A government contractor defense is applicable when the United States exercises its discretion over the design of an item it purchases from a contractor. *See Trevino v. General Dynamics Corp.,* 865 F.2d 1474, 1480 (5th Cir.1989), *cert. denied,* 493 U.S. 935, 110 S.Ct. 327, 107 L.Ed.2d 317 (1989). The United States exercises its discretion over a design by actually choosing a design feature. *Id.* The United States delegates design discretion by either buying a product designed by a private manufacturer; contracting for the design of a product or a feature of a product, leaving the critical design features to the private contractor; or when it contracts out the design of a concept generated by the government, requiring only that the final design satisfy minimal or general standards established by the government. *Id.*

In asserting a *Boyle* defense Ingersoll points to the fact that the United States specified the bearing packaging and the degree of control the United States held over any future changes in bearing design. Those facts do not demonstrate any exercise of discretion in the bearing's design. Ingersoll also points to testimony that it describes as establishing the United States approved reasonably precise specifications for the –5 bearing. In fact that evidence is proof of nothing more than a requirement that the final design satisfy minimal or general standards. Significantly, Ingersoll refers to testimony of witnesses who described the bearing as being designed or chosen by Bell. Those witnesses were unable to relate any involvement of the United States, in the design of the –5 bearing other than an exercise of final approval designed to comply with its general requirements. *Id.*

■ In its eighth point Ingersoll complains the trial court erred in applying Texas and North Carolina law rather than Nebraska and Michigan law that would limit the damages recoverable by the appellees. Ingersoll contends that the decedents were domiciled in Nebraska and Michigan, a contention not challenged by appellees, and that the laws of those states present the most significant relationship to actual damages. In response, appellees argue that the trial court appropriately followed the laws of Texas and North Carolina. The trial court concluded that North Carolina was the state with the most significant relationship to the case, and absent proof of North Carolina law, assumed it was the same as Texas law.

■ In Texas, conflicts cases sounding in tort are governed by the most significant relationship test stated in sections 6 and 145 of the Restatement (Second) of Conflict of Laws. *See Gutierrez v. Collins,* 583 S.W.2d 312, 318 (Tex.1979). Section 6 sets out the general principles involved while section 145(2) directs courts to consider particular contacts in applying the general principles: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered. RESTATEMENT (SECOND) OF CONFLICTS § 145 (1971). The quality of contacts is more important than the number of contacts. *See Gutierrez,* 583 S.W.2d at 319. The law selected by application of

§ 145 determines the measure of damages. *See* RESTATEMENT (SECOND) OF CONFLICTS § 171 (1971).

■ This case involves contacts with other states including Connecticut, where the bearing was manufactured, and Alabama, where the crash occurred.[3] Those contacts do not concern us as no party contends the laws of those states apply. *See Crisman v. Cooper Industries*, 748 S.W.2d 273, 276 (Tex.App.—Dallas 1988, writ denied). Accordingly, our concern is limited to determining whether Texas and North Carolina or Michigan and Nebraska are more significantly related to the facts of the case. If neither proposed choice of laws is more significantly related it is appropriate to look to the strength of the State policies underlying the conflict. *See Huddy v. Fruehauf Corp.*, 953 F.2d 955 (5th Cir.1992).

■ Generally, the place of alleged misconduct is more significant than the residence of the plaintiffs. *See In re Air Disaster at Ramstein Air Base, Germany*, 81 F.3d 570, 577 (5th Cir.1996). In this case neither Michigan nor Nebraska bears any relationship to the allegations of misconduct; while the choice and design of the –5 bearing occurred at least in part in Texas and the failed bearing was used in a helicopter assigned to a base in North Carolina. More importantly, we find there is a particular reason why the parties domicile presents an illogical choice of laws, particularly in a case involving decedents or plaintiffs domiciled in different states. As Ingersoll points out, damages recoverable in wrongful death cases vary from state to state. As a consequence, in a wrongful death case involving several survivors as plaintiffs, the court might be required to submit differently framed damage questions for different plaintiffs who otherwise bear a similar relationship to a decedent. Indeed, as Ingersoll points

out, surviving parents of an adult domiciled in one state could be entitled to recover damages while surviving parents of another adult domiciled in a different state could be denied any recovery. Point eight is overruled.

■ In its ninth point, Ingersoll argues some of the awards of actual damages were excessive. Ingersoll complains of the damage awards to the estate of each marine, based upon a jury finding of conscious pain and anguish, and of the damage awards to the survivors of both Marines. Ingersoll alleges the damages awarded each estate were excessive because there was no evidence that either marine was conscious following impact or that they experienced any anguish between the time the helicopter passengers discovered their plight and impact. Appellees cite the testimony of two other members of the helicopter crew, Fleugge and Shearer, as evidence that the Marines suffered mental anguish before impact.

Fleugge testified:

We started slowing down to land in a field; and as they slowed their airspeed, the helicopter started to turn. We lost our tail rotor authority, and that's when we realized it. And, hell, the next thing you know we hit those damn trees and—and then we was on the ground.

Fleugge also testified that he did not think it was going to be as bad as it turned out, but that a lot of things went through his mind, "you know, my wife and things of that nature." Shearer described a violent shudder that caused them to realize that something was wrong that occurred "under thirty seconds, maybe twenty seconds," before the crash.

■ The above described evidence, albeit circumstantial, is certainly more than a scintilla of evidence to support the jury finding as to the damage awards to the

---

**3.** There were other parties to the suit including Mobil Oil Corporation. Other than a passing reference, in appellees' brief, to Mobil's presence in Jefferson County, the briefs

do not address whether or not the actions against these other parties are important to this conflicts issue.

Marines' estates. Ingersoll also challenges the awards of damages to the Marines' survivors. Ingersoll's challenge is a general complaint that does not specifically address each of the awards. Ingersoll complains of the total jury award of damages but does not address the effect of remittitur. Ingersoll does not address the appropriate standard of review. *See Larson v. Cactus Utility Co.,* 730 S.W.2d 640, 641 (Tex.1987). Ingersoll does not persuade us that the individual damage awards are so excessive as to offend the *Pool* standards. *See Pool,* 715 S.W.2d at 635.

■■■■■ Under its ninth point Ingersoll also argues we are compelled to grant a new trial on all issues because of the Supreme Court's holding in *World Oil Co. v. Hicks,* 129 Tex. 297, 103 S.W.2d 962, 964 (1937). We note that the court in *World Oil Co.* recognized that remittitur is the appropriate remedy to cure an excessive verdict, and that holding does not require that we order a new trial. *Id.* at 965. Point of error nine is overruled. At the same time we overrule Ingersoll's third point of error complaining that the jury damage award was so excessive as to prove jury prejudice.

■■■■■ In its tenth point Ingersoll challenges the legal sufficiency of the evidence that Fafnir, after it was acquired by Ingersoll, was grossly negligent. The test for the legal sufficiency of the evidence to support a gross negligence finding involve both objective and subjective parts. *See Universal Services Co., Inc. v. Ung,* 904 S.W.2d 638, 641 (Tex.1995); *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 21–22 (Tex.1994); *Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 326 (Tex.1993). When faced with a challenge to the legal sufficiency of the evidence to support a gross negligence finding, we apply the traditional standard of review, considering the favorable evidence while disregarding evidence to the contrary. *Id.* However, there must be evidence of both parts of gross negligence:

(1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the right, safety, or welfare of others.

*See Moriel,* 879 S.W.2d at 23. Appellees' brief does not point us to evidence of either element of gross negligence. Instead, appellees rely upon their discussion of the evidence contained in their response to Ingersoll's fourth point.

Appellees broadly proclaim that the inherent risk of a defective tail rotor bearing and the probability of catastrophic failure satisfied the first element and that evidence Fafnir (Ingersoll) knew of the risks but chose not to recall, replace, or even warn about possible defective bearings satisfied the second. We sustain point ten because there was no evidence that satisfied the objective element of gross negligence. At the same time, we overrule appellees' second cross-point concerning punitive damages.

■■■■■ The only evidence supporting any negligence of Fafnir (Ingersoll) is discussed in our disposition of Ingersoll's fourth point. Considered in the most favorable light the evidence does not support a finding that Fafnir (Ingersoll) was guilty of conduct creating a probability of harm to others. While the jury could infer that a helicopter bearing failure could end in loss of life, there was no evidence that Fafnir's conduct would probably result in a bearing failure. Evidence of simple negligence will not suffice to prove either part of gross negligence. *See Ung,* 904 S.W.2d at 641.

■■■■■ In point eleven and twelve Ingersoll complains the court erred in indemnifying Textron and in awarding Textron attorneys' fees and expenses. The

agreement selling Fafnir to Ingersoll required Ingersoll to indemnify Textron for product liability claims including attorneys' fees and expenses. Ingersoll complains indemnity was improper because Textron colluded with appellees thereby discharging Ingersoll of any obligation to indemnify Ingersoll. Ingersoll cites closing argument by Textron concluding the evidence supported a finding that its bearing was defective. We conclude that the argument was not an unreasonable summation of the evidence. Ingersoll also urges that Textron hired witnesses to criticize the bearing. The testimony was subject to cross examination and does not appear improper. This is not a case in which a, "settling defendant," was pressured to contribute "discovery material, peremptory challenges, trial tactics, supportive witness examination and jury influence to the plaintiff's cause." *See State Farm Fire and Cas. Co. v. Gandy*, 925 S.W.2d 696, 710 (Tex.1996). Textron's trial strategy does not reflect that it was a party to collusion. We find no evidence of collusion and overrule points eleven and twelve.[4] We also overrule Ingersoll's second point of error complaint that a lack of antagonism between appellees and Textron required a mistrial.

■ We sustain Ingersoll's thirteenth point of error complaining the court erred by holding Ingersoll–Rand Corporation jointly and severally liable with Torrington. Appellees do not contest the issue, and there is no evidence to hold the parent company liable along with its subsidiary.

■ In its fourteenth point of error Ingersoll complains there was no evidence to support the $75,000.00 award of fees to the attorney ad litem. The work of an ad litem in a case that is tried rather than settled is largely obvious to the trial judge who is witness to the service rendered. As a clear abuse of discretion is not apparent from the record, we overrule Inger-

soll's complaint. *See Dover Elevator Co. v. Servellon*, 812 S.W.2d 366, 368 (Tex.App.— Dallas 1991, no writ).

■ In appellees' first cross-point, they complain the trial court failed to apply the proper factual sufficiency standard in remitting actual damages. Appellees ask this Court to reinstate the entire award, an invitation we decline. A party may not complain on appeal of an action or ruling which he invited or induced. *See U.S. Fire Ins. Co. v. Pettyjohn*, 816 S.W.2d 839, 843 (Tex.App.—Fort Worth 1991, no writ); *Travelers Ins. Co. v. Williams*, 603 S.W.2d 258, 262 (Tex.Civ.App.—Corpus Christi 1980, no writ); *DeLee v. Allied Fin. Co. of Dallas*, 408 S.W.2d 245, 247 (Tex.Civ.App.—Dallas 1966, no writ). The record reveals that although the trial judge initially suggested a remittitur amount, all parties agreed that he should change his order and make a different remittitur. The appellees suggested the specific amounts of actual damages they wanted to remit and tendered the order to the judge to sign. We overrule appellees' first cross-point.

■ One matter remains. The briefs filed in this case are replete with assertions, not supported by the record, that errors were waived; misstatements of the record; and epithets directed toward the arguments and theories proposed by other parties. These things are inappropriate and have hindered this Court in the disposition of this complicated case.

We modify the judgment by deleting the holding that Ingersoll–Rand Corporation was jointly and severally liable to the appellees. We reverse that part of the judgment awarding the appellees punitive damages against Ingersoll and Torrington and render judgment denying punitive damages. In all other respects the judgment of the trial court is affirmed.

---

4. Because, in addressing point of error five, we sustained the product liability findings against Textron we need not address Inger-soll's assertion that, under New York law, Textron was not entitled to be indemnified for its own negligence.

AFFIRMED IN PART; REVERSED AND RENDERED IN PART.

BURGESS, J., concurring and dissenting.

I concur with all aspects of the majority's opinion with the exception of Torrington's tenth point of error and the appellees' two cross-points.

The tenth point of error challenges the legal sufficiency of the gross negligence findings. The majority finds there is no evidence of the objective element of gross negligence. In *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 21–23 (Tex.1994), the court stated:

> Gross negligence thus involves two components: (1) the defendant's act or omission, and (2) the defendant's mental state. As defined, the act or omission element must involve behavior that endangers the rights, safety, or welfare of the person affected. Tex.Civ.Prac. & Rem.Code Ann. § 41.001(5) (Vernon Supp.1994). Gross negligence, then, differs from ordinary negligence with respect to both elements—the defendant must be "consciously indifferent" and his or her conduct must "create an extreme degree of risk." *Williams*, 699 S.W.2d at 573; *see also Wal–Mart*, 868 S.W.2d at 326 ("We reaffirm that a gross negligence finding may be upheld on appeal only if there is [legally sufficient] evidence that a) the defendant's conduct created an extreme risk of harm, and b) the defendant was aware of the extreme risk.").

As we have recently reiterated, the test for gross negligence "contains both an objective and a subjective component." *Wal–Mart*, 868 S.W.2d at 326. Subjectively, the defendant must have actual awareness of the extreme risk created by his or her conduct. *Id.* Objectively, the defendant's conduct must involve an "extreme degree of risk," a threshold significantly higher than the objective "reasonable person" test for negligence. *Id.* Extreme risk is a function of both the magnitude and the probability of the anticipated injury to the plaintiff. As we said in *Wal–Mart*, the "extreme risk" prong is not satisfied by a remote possibility of injury or even a high probability of minor harm, but rather "the likelihood of serious injury" to the plaintiff. *Id.* at 327. (emphasis omitted).

An act or omission that is merely thoughtless, careless, or not inordinately risky cannot be grossly negligent. Only if the defendant's act or omission is unjustifiable and likely to cause serious harm can it be grossly negligent.

It should not be surprising, perhaps, that many efforts to analyze gross negligence findings confuse the defendant's mental state with the nature of the defendant's act or omission. The mental state involves awareness of the risk, and thus the two are interrelated. As Prosser and Keeton point out, most jurisdictions distinguishing gross from ordinary negligence have focused on either the difference in the defendant's mental state or the difference in riskiness of the defendant's act, but the two definitions have tended to merge and "take on the same meaning, of an aggravated form of negligence...." Prosser & Keeton § 34 at 214 (5th ed. 1984), *cited in Williams*, 699 S.W.2d at 572. But this is not so in Texas. Ours is "a hybrid definition, distinctive to this state ... combin[ing] both of the traditional tests for gross negligence." *Williams*, 699 S.W.2d at 572–73.

*Williams* also suggested that gross negligence could be proved if "under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others." *Id.* at 573. This language is potentially misleading, however. It is true that the relative riskiness of the defendant's *action* can be determined by an objective "extreme risk" test, but before a gross negligence finding can be sustained the evidence must show *both* that the act was likely to

result in serious harm *and* that the defendant was consciously indifferent to the risk of harm. *Wal–Mart*, 868 S.W.2d at 326. The requirement of conscious indifference, which our law requires, is superfluous unless it requires proof that the defendant had actual subjective knowledge of an extreme risk of serious harm. *Williams*, therefore, should not be read to import the objective "reasonable person" standard for ordinary negligence into the distinctly different process of determining subjective mental state in gross negligence cases.

Recognizing the practical difficulty of producing direct evidence of conscious indifference short of the defendant's admission, *Williams* quite reasonably stated that "the plaintiff need not prove the defendant's subjective state of mind by direct evidence," and authorized proof of this element by circumstantial evidence. *Williams*, 699 S.W.2d at 573 ("reaffirm[ing][the] holding in *Burk Royalty [Co. v. Walls]*," 616 S.W.2d [911] at 922). We hereby reaffirm our holding that the defendant's subjective mental state can be proven by direct or circumstantial evidence.

Determining whether an act or omission involves extreme risk or peril requires an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight. In every negligence or gross negligence case, some injury has allegedly occurred. However, the magnitude of the injury may be entirely disproportionate to the riskiness of the behavior. For example, inadvertently dropping a wooden board into the metal hold of a ship may constitute negligence, but cannot be *gross* negligence. This is so even though the board, upon landing, triggers a Rube Goldberg chain reaction, eventually causing the whole ship to explode. *See In re Polemis*, [1921] 3 K.B. 560. If somebody has suffered grave injury, it may nevertheless be the case that the behavior which caused it, viewed prospectively and without the benefit of hindsight, created no great danger. In such a case, punitive damages are not appropriate. In summary, the definition of gross negligence includes two elements:

> (1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

There was testimony that the tail rotor drive shaft system provided directional control of the helicopter. Bell Helicopter, the manufacturer, issued an air worthiness directive concerning the –5 bearings to "prevent possible failure of a tail rotor driveshaft hanger bearing which could result in catastrophic failure of the tail rotor driveshaft and subsequent loss of control of the helicopter, . . . ." A Torrington employee acknowledged he knew people were riding in helicopters with their bearings and knew that if the grease was bad the bearing might fail and it might leave widows and orphans. Clearly there is some evidence to satisfy both elements of the *Moriel* test. Therefore, I would overrule point of error ten.

The cross-points deal with the trial court's remittitur of both the actual and punitive damages. The majority holds the appellees are estopped from raising the issue because they invited the error. The record does not support this conclusion. The trial judge signed a final judgment on August 15, 1996, reflecting the jury award. On September 9, defendants/appellants filed a motion for remittitur. On October 28, the judge entered an order suggesting a lump sum remittitur amount for each plaintiff/appellee. On October 29, the plaintiffs/appellees filed an acceptance of

the remittitur. On October 30, the defendants/appellants filed their objection to the Order of October 28th. There were several objections, but the one pertaining to this issue was that the judge had ordered the damages reduced in a lump sum amount as to each plaintiff/appellee, while the jury had allocated damages among various elements. On November 13, defendants/appellants filed another motion for remittitur, this one addressing the October 28 Order and again asked the judge to specify which jury findings were excessive and to further reduce the amounts. On November 21, the plaintiffs/appellees again filed a remittitur in accordance with the October 28 order. They also filed a response to the objections which recognized the court's remittitur should be specific as to the individual elements of damage and included suggestions as to how the lump sum amounts in the October 28 Order should be allocated among the various elements submitted to the jury. A hearing was held on November 25 regarding the remittitur issue. At that hearing counsel for the plaintiffs/appellees stated:

... not knowing what the court would do, I have filed and am prepared to accept remitttur; and I did it three different ways. I have three different orders. One is the original. If the Court disagreed with us, both of us, the original.

The second one is where the noneconomic damages are reduced; and the third one is where all of them, just proportionately, to get to that figure.

And in my response I am arguing for the noneconomic damages. They are smaller, but we won't get to that point. I didn't know any other way. But if the Court has another—I have got a blank thing. Whatever the Court says, we will do.

It is clear that the Court had long since determined there was going to be a remittitur. The plaintiffs/appellees were simply trying to accommodate the court in providing three possible options; the original

lump sum remittitur; a specific order and a blank order. This accommodation should not be viewed as any acquiescence to the remittitur, thus we should consider the cross-points.

In reviewing a trial court's order of remittitur, the proper standard of review is factual sufficiency, not abuse of discretion. *Larson v. Cactus Util. Co.,* 730 S.W.2d 640, 641 (Tex.1987); *Pope v. Moore,* 711 S.W.2d 622, 623–24 (Tex.1986); *Stokes v. Puckett,* 972 S.W.2d 921, 927 (Tex.App.—Beaumont 1998, no pet.). We must examine all of the evidence in the record to determine whether sufficient evidence supports the damage award, upholding a remittitur only if some portion of the award is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pope,* 711 S.W.2d at 624. Furthermore, because the question of whether damages are excessive and that a remittitur is appropriate is a factual determination, the Texas Supreme Court lacks jurisdiction to review such findings. TEX.CONST. art. V, § 6; TEX.GOV'T CODE ANN., § 22.225(a) (Vernon 1988 & Supp. 1999); *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

In assessing personal injury damages, the jury has wide latitude in determining the amount of the award. Matters of mental anguish and loss of love, companionship, society and support, which are necessarily speculative and not subject to precise mathematical calculations, are particularly within the province of the jury to resolve and to determine appropriate amounts. *Maritime Overseas Corp.,* 971 S.W.2d at 402; *Southwest Texas Coors, Inc. v. Morales,* 948 S.W.2d 948, 951–52 (Tex.App.—San Antonio 1997, no writ). Likewise, the court of appeals may not pass upon the witnesses' credibility or substitute its judgment for that of the jury, even if the evidence would clearly support a different result. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex.1986).

Therefore, I would hold the trial court erred in ordering a remittitur of both the actual and punitive damages and would reinstate the jury's verdict.